**Dr. Gustavo MARIN, Plaintiff,**

v.

**CITIZENS MEMORIAL HOSPITAL, et al., Defendants.**

Civ. A. No. V-84-7.

United States District Court,
S.D. Texas,
Victoria Division.

Sept. 12, 1988.

Larry D. Woody, Woody, Gumm, Heintz & Villafranca, P.C., Victoria, Tex., for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAZEN, District Judge.

This case was tried before the Court on March 7–8, 1988. The following constitute findings of fact and conclusions of Law under Rule 52(a), Fed.R.Civ.P.

*Background*

On October 18, 1985, the Court granted partial summary judgment for the Plaintiff. The memorandum supporting that action is incorporated herein by reference. The Court found that the Defendant Hospital did, in July 1982, deny Dr. Marin a property right without procedural due process. A letter of July 23, 1982 advised Dr. Marin that the Board of Managers on July 21, 1982, "upon completion of (his) provisional period," granted him active staff privileges but without obstetrical and major surgical privileges. Earlier, on January 16, 1981, the Hospital had advised Dr. Marin that his 12-month provisional period on the staff had ended and that the Credentials Committee had recommended he be advanced to active status. By letter of March 31, 1982, Administrator David Brown advised Dr. Marin that the Board of Managers had "reappointed him to the active staff on March 17, 1982," adding the phrase "Provisional status, with privileges as documented on your application." Article IV of by-laws of the Hospital contains the categories of medical staff, one of which is active and the other is provisional. Nothing in the by-laws indicates a category of "active staff, provisional status." Brown explained at trial that active status was somehow a "bookkeeping" matter apart from the question of clinical privileges. At any rate, it appears that in July of 1982 Dr. Marin was on the active staff, enjoying obstetrical and surgical privileges, provisional or otherwise.

According to the minutes of the OB–GYN section meeting on July 6, 1982 (Exhibit S), there was a general discussion

"regarding obstetrical privileges for Dr. Gustavo Marin whose second provisional period expires within the next few days." The OB–GYN section unanimously recommended to the Credentials Committee that Dr. Marin's obstetrical privileges be eliminated.

On July 9, 1982, the Credentials Committee accepted that recommendation and added that all major surgical privileges should be denied. According to the minutes of that meeting (Exhibit T), the Credentials Committee also believed that the "second Provisional period of Dr. Gustavo Marin (was) being nearly completed."

On July 20, 1982, the Executive Committee met and accepted the recommendation of the Credentials Committee. The next day, July 21, 1982, the Board of Managers approved the recommendation of the Executive Committee with respect to Dr. Marin.

It is undisputed that, up to this time, Dr. Marin was not given notice of any adverse action concerning his privileges. He testified, without contradiction, that he first learned of the restriction of privileges from a nurse one evening when he was attempting to admit a female patient in labor.

Dr. Marin promptly requested a hearing. An *ad hoc* committee was appointed, and scheduled a hearing. Dr. Marin failed to appear at the hearing because of a previously scheduled trip to Colombia. The meeting was rescheduled for September 7, 1982. The committee announced that it was meeting pursuant to Article X, Section 1(B) of the by-laws. This section generally provides that when a doctor receives notice of a decision adversely affecting his staff status or his exercise of clinical privileges, he is entitled to a hearing by a committee appointed by the governing body with appellate review thereafter by the governing body, before the governing body makes a final decision. The difficulty with invoking this section, however, is that it purports to apply only where the governing body has made a decision "not based on a prior adverse recommendation by the Executive Committee." In this case, the Board of Managers had already acted adversely to Dr. Marin upon receiving a recommenda-

tion by the Executive Committee. Therefore, the more appropriate by-law provision would have been Article X, Section 1(A). However, that section implies that if the Executive Committee proposes to recommend an adverse decision to the governing body, it should first notify the doctor and provide him a hearing before an *ad hoc* committee before making the final recommendation to the governing body. This was not done.

Dr. Marin was granted a hearing before an *ad hoc* committee, therefore, but only after rather than before the adverse decision by the Executive Committee and the Board of Managers. Dr. Marin also complains that the notice of the *ad hoc* committee hearing (Exhibit D) did not specifically advise him of the charges against him nor of the evidence to support that charge. According to the transcript of the meeting, Dr. Luke Robinson of the OB–GYN section reported that he had examined eight surgical cases and three gynecological procedures performed by Dr. Marin. He selected four cases which he indicated would disclose "some of the reasons for our recommendations." Dr. Robinson discussed the four cases in some detail and indicated that Dr. Marin had previously been counseled about three of them. Dr. Marin was then given an opportunity to speak. He first read to the committee a letter dated July 27, 1982, which he had sent to Dr. R.C. Allen, Jr., Chief of Staff. Dr. Marin then discussed the four cases in question, defending his performance. At the conclusion of Dr. Marin's testimony, the committee voted to uphold the prior adverse recommendation.

On October 4, 1982, the Board of Managers convened for appellate review. According to the transcript of the meeting (Exhibit 5), Dr. Marin was present but his attorney acted as spokesman. Attorney Woody first protested to the Board that the procedures followed to date were incorrect. He then read a rather lengthy, detailed response by Dr. Marin to the cases discussed at the *ad hoc* committee meeting. At the conclusion of that presentation, Dr. Robinson briefly responded. The Board then

went into executive session and returned to formally accept the recommendation of the Executive Committee.

*Procedural Due Process*

█ The "root requirement" of the due process clause is that an individual be given an opportunity for a hearing before he is deprived of a significant property interest. *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). Article X of the Hospital's by-laws recognized that requirement by providing that before a final decision is made affecting, among other things, a doctor's exercise of clinical privileges, that doctor is entitled to a hearing. In this case, contrary to the by-laws, the decision to restrict Dr. Marin's clinical privileges was approved by various committees all the way through the Board of Managers without any notice being given to him. The Court reiterates the earlier conclusion that this procedure violated his procedural due process rights. The due process violation, however, did not result merely from the Hospital's violations of its by-laws. Even if an action by a governmental entity violates its own by-laws, there is no due process violation unless that conduct also violates minimum constitutional standards. *Ramirez v. Ahn*, 843 F.2d 864 (5th Cir. 1988); *Brown v. Texas A & M Univer.*, 804 F.2d 327 (5th Cir.1986). To that extent, Dr. Marin's contention that he was constitutionally entitled to all procedures set forth in the by-laws is incorrect. Of course, the fact that the by-laws provide detailed procedures to be followed when removing or limiting a doctor's clinical privileges tends to establish the existence of a protected property interest. *Northeast Georgia Radiological Assoc. v. Tidwell*, 670 F.2d 507, 511 (5th Cir.1982).

█ Although Dr. Marin was given no notice of the proceedings prior to the initial adverse decision, he was afforded two subsequent hearings. While those hearings cannot "cure" the initial defect, they do affect the compensable damages. It is the rule in this circuit that loss of pay and benefits should not be awarded from the date of a procedurally improper decision until the date of a procedurally proper hearing, if the same decision would have resulted absent the procedural defect. *Simien v. City of San Antonio*, 809 F.2d 255, 258 (5th Cir.1987). The Court must then examine the circumstances of the *ad hoc* committee hearing of September 7, 1982 and the Board of Managers' review of October 4, 1982.

It is true, as Plaintiff contends, that the notice of the *ad hoc* committee meeting did not specify charges against Dr. Marin nor did it list the medical charts being questioned, in violation of Article X, Section 3(B) of the by-laws. It is also true, however, that at least three of the four medical cases presented to the committee had previously been discussed at length with Dr. Marin. The minutes of the meeting reflect that Dr. Marin was thoroughly conversant with the four cases and was able to discuss them in detail. At no time did he suggest that he was unprepared nor did he request further time to develop his position. In a similar situation, where the doctor's notice of a hearing only contained the time and the place, the Fifth Circuit found no constitutional deprivation where the evidence was clear that the doctor knew of the reasons why he had been denied staff membership. *Everhart v. Jefferson Parish Hosp. Dist. No. 2*, 757 F.2d 1567, 1570 (5th Cir.1985). Other circuits have similarly held that written notice of specific charges is not required where past events or discussions have provided a physician with notice of the charges against him. *Yashon v. Hunt*, 825 F.2d 1016, 1025 (6th Cir.1987); *Ong v. Tovey*, 552 F.2d 305, 308 (9th Cir. 1977). Prior to the final meeting of the Board of Managers, moreover, Dr. Marin clearly knew what cases were in controversy. Both he and his attorney appeared at that meeting. Although Dr. Marin apparently chose not to speak, his attorney read a detailed letter reiterating Dr. Marin's position on the four cases in question.

Under these circumstances, the Court must conclude that Dr. Marin was ultimately provided with adequate process. He consistently has taken the position that because an initial error was made, the only

solution would have been for the Board of Managers to "completely set aside their decision and start anew." *Plaintiff's Trial Brief* at page 47. He does not explain, however, where the new start should have been and how the result would have changed. The adverse decision originated at a meeting of the OB–GYN committee, of which Dr. Marin was a member. The evidence discloses that he was invited to the meeting of July 6, 1982, but failed to attend. That committee then made its recommendation to the Credentials Committee. There is nothing in the by-laws or elsewhere to indicate that Dr. Marin was entitled to a hearing at that level. The hearing failure occurred at the Executive Committee level. The proper procedure was for the Executive Committee, upon receiving notice of an adverse recommendation from the Credentials Committee, to convene an *ad hoc* committee meeting prior to accepting the recommendation and forwarding it to the Board of Managers. While this was not done initially, it was done subsequently. Plaintiff suggests that these subsequent hearings were merely "ceremonial" because the *ad hoc* committee already knew of the prior action mistakenly taken by the Executive Committee and the Board of Managers. However, even under any "start again" scenario, the same would be true. The only way to have avoided that circumstance would have been to remove all the members of the Executive Committee and Board of Managers and replace them with new ones.

*Substantive Due Process*

Plaintiff also asserts that the restriction of his clinical privileges constituted a substantive denial of due process. Citing *Roane v. Callisburg Indep. Sch. Dist.*, 511 F.2d 633, 639 (5th Cir.1975), he contends that the Defendants acted with improper motive and their decision was pretextual, arbitrary, and capricious. *Trial Brief* page 61. The Court disagrees in part. In the medical context, substantive due process is satisfied if decisions are judged on grounds that are reasonably related to the purpose of providing adequate medical care. *Everhart*, 757 F.2d at 1571. At least as to the question of obstetrical

privileges, the record is "devoid of any inference that considerations other than the medical competence of Dr. (Marin) were involved." *Woodbury v. McKinnon*, 447 F.2d 839, 845 (5th Cir.1971). Plaintiff has strenuously argued throughout this case that the criticism of his obstetrical practice derived from philosophical differences between him and other practitioners. For example, at the appellate hearing, attorney Woody declared:

> "Childbirth is a natural function, thinks Dr. Marin, and the knife is best left alone unless absolutely necessary. That is the credo he lives by. Don't cut unless nature and God can't take care of it."

Exhibit 5 at page 33.

> "Now, I would like to say something that Dr. Marin believes in very strongly, and that is from the oath that he takes when he becomes a doctor. The very first thing it says is 'First cause no harm.' And he believes strongly in the physician cooperating with God and nature." Exhibit 5 at page 42.

Notwithstanding the possible merits of that philosophy, the Hospital, not the Court, "must set the level of competence to be required of staff members." *Laje v. R.E. Thomason Gen. Hosp.*, 564 F.2d 1159, 1162 (5th Cir.1977). The Court should not substitute its own evaluation of the evidence heard by the hospital authorities. *Sosa v. Board of Managers of Val Verde Memorial Hosp.*, 437 F.2d 173, 177 (5th Cir.1971). At least with respect to the obstetrical privileges, the evidence presented to the *ad hoc* committee and reviewed by the Board of Managers was clearly relevant and sufficient to support the decision. Although Plaintiff suggests that the Hospital's by-laws must set forth an objective standard of competency for the various physicians, the pertinent question is whether the evidence relied on by the Hospital was reasonably related to the operation of a hospital and its attending medical staff. *Yashon*, 825 F.2d at 1025. Likewise, Plaintiff has failed to produce evidence that the Board members or other physicians were actually biased against him. *Laje*, 564 F.2d at 1162;

*Megill v. Board of Regents,* 541 F.2d 1073, 1079 (5th Cir.1976).

■ The blanket removal of Defendant's major surgical privileges stands on a different footing. The initial recommendation of the OB–GYN section made no reference to major surgical privileges, as indeed that would have been outside the scope of the OB–GYN section. Nevertheless, the Credentials Committee not only recommended denial of all obstetrical privileges, but also of all major surgical privileges. This additional statement is found in the minutes of that meeting. (Exhibit T): "It was further requested that the Surgery Section Chief assist the Committee in determining the scope of allowable privileges." Dr. Reuben Koenig, Chairman of the Credentials Committee, explained that the committee apparently believed there was some overlap between certain obstetrical procedures and major surgery. Therefore, although no one had made any specific recommendation about general surgical privileges, the Committee decided to "suspend" those privileges pending further study by the Surgical Section. Dr. Koenig suggested that the suspension was intended to be temporary until the Surgical Section would have an opportunity to consider the matter further and make a more precise recommendation. Nothing in the evidence indicates that any further study was made. Instead the recommendation crystallized into an absolute removal. When Dr. Marin was ultimately given a hearing before the *ad hoc* committee, the discussion almost exclusively involved obstetrical privileges. The only reference to surgical privileges was a brief comment by Dr. Robinson that certain other doctors were of the "general opinion" that there was some kind of "problem" having to do with "a sort of a postulation of what could occur under major surgical situations where a problem could occur." (Exhibit 2, pgs. 25–26). The Court concludes that the withholding of Dr. Marin's general surgical privileges was completely arbitrary and not based on any relevant evidence.

### Anti-trust Violations

■ Plaintiff's Second Amended Complaint also alleges antitrust violations under both the Sherman and the Clayton Acts. He alleges that the various Defendants conspired to restrain trade by conspiring to reduce or eliminate Dr. Marin's "competitive potential." He also alleges that the Hospital denied him clinical privileges to prevent the use of "therapeutic regimens which reduce the hospital's revenues," an allegation for which absolutely no evidence was produced. Plaintiff argues that the Hospital and the Defendant doctors formed a group boycott which is *per se* illegal under the Sherman Act. He insists that this result follows from the procedural due process error, relying strongly on *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

The Court disagrees and is convinced that the "rule of reason" is the appropriate approach in this case. In *Northwest Wholesale Stationers v. Pacific Stationery and Printing,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Supreme Court clearly held that, "the absence of procedural safeguards can in no sense determine the antitrust analysis." 472 U.S. at 293, 105 S.Ct. at 2619. The Supreme Court further explained that the rule of reason generally applies unless the challenged action falls into a category of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable. 472 U.S. at 289, 105 S.Ct. at 2617. In *Weiss v. York Hosp.,* the court held that a medical staff is entitled to exclude individual doctors on the basis of their lack of professional competence or unprofessional conduct, and that the rule of reason is applicable to "self-regulation of this type." 745 F.2d 786, 820 (3rd Cir.1984). *Weiss* further held that even conduct normally subject to the *per se* rule should instead be subject to the rule-of-reason analysis if the challenged conduct is premised on public service or ethical norms. *Id.* The court derived this exception from *Arizona v. Maricopa County Medical Soc.,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) and *Goldfarb v. Virginia State Bar,* 421

U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). The Fifth Circuit has recently held that there must be "principled limits on the *per se* rule" and suggested that it be applied with caution. *Consolidated Metal Products, Inc. v. American Petroleum Inst.,* 846 F.2d 284, 290 (5th Cir.1988).

■ Under the rule of reason, Plaintiff must show that the Defendants' actions "amounted to a conspiracy against the market—a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare." *Consolidated Metal Products,* 846 F.2d at 293. Plaintiff must show an unreasonable restraint of trade by proving either an unlawful purpose or an anticompetitive effect. *Id.* at 294–295. Plaintiff's proof fails. There is simply no credible evidence to support the thesis that the Defendants wanted to reduce competition, monopolize business, drive up prices, or in any other way reduce consumer welfare. No evidence was adduced as to why the Hospital would profit by restricting the Plaintiff's clinical privileges. Most of the doctors involved in this episode could not be considered competitors of the Plaintiff, who is primarily a family practitioner. His surgical and child delivery cases at Defendant Hospital were few, both in absolute and relative terms, and not likely to threaten competitors nor cause envious feelings. This would be particularly true since Plaintiff claimed that most of his clients were indigent. While members of the OB–GYN committee were perhaps "competitors" in the broadest sense of the term, none of the *ad hoc* committee members were such. Dr. Richard Allen, Jr., the Chief of Staff, was a family practitioner, but his uncontradicted testimony was that he has not accepted new clients since 1978. Several of the doctors involved in the decision process, particularly Dr. Luke Robinson, had worked with Dr. Marin before and had counseled him on his techniques, apparently in a cooperative spirit. The Court is convinced that the Defendants were not motivated by any anti-competitive reasons but instead were concerned with the quality of medical care being delivered at the Hospital. Restricting staff privileges to doctors who maintain a certain level of medical ability is within the scope of a hospital's "public service function" and restricting staff privileges to doctors who maintain a basic level of medical competency is ultimately pro-competitive not anti-competitive. *Weiss,* 745 F.2d at 821, n. 60.

*Damages.*

■ Dr. Marin asks for both compensatory and punitive damages. As indicated earlier, the fact that Dr. Marin was afforded two hearings shortly after the withdrawal of privileges in July of 1982, and these hearings upheld the earlier decision, prevents him from receiving damages for economic loss resulting from denial of obstetrical privileges. *Simien v. City of San Antonio, supra.* Although the Court has found a substantive due process violation in the withdrawal of surgical privileges, the economic damages from that loss are too speculative. Dr. Marin estimated that in 1981 he had 4,000 active patients but that this figure dropped to 1,000 after losing his privileges. He also testified, however, that many of his clients were indigent and a very large percentage were medicare or medicaid patients. Further, many of these patients had minor problems not involving either obstetrics or major surgery. Dr. Marin's tax returns reflect approximately a 25% loss of net income from 1982 to 1983. His net income increased thereafter and in 1985 exceeded his 1982 income. He left Victoria, Texas in 1983, thereafter practicing medicine in Bryan, Houston, San Antonio, Bryan again, and two different locations in Dallas. Several of these moves were made because of contractual disputes unrelated to the Victoria incident. Dr. Marin never applied for staff privileges at any hospital in these cities. In 1980–1982, Dr. Marin actually performed few surgical procedures at Defendant Hospital and most of those related to obstetrics. Very few could be considered "major surgery." (Exhibit 6). For that matter, the evidence further indicates that Dr. Marin's baby deliveries from 1979 to 1983 were very few, both in absolute numbers and in relation to the total number of deliveries at the Hospital. (Exhibit 8). Because Dr. Marin historically

did not perform substantial numbers of major surgery at Defendant Hospital, because Defendant Hospital is not the only one in Victoria, because Dr. Marin left Victoria and thereafter never even attempted to be admitted to the staff of any other hospital, it is difficult to quantify the loss he might have sustained from being unable to perform major surgery at the Defendant Hospital.

■ Dr. Marin is, however, entitled to recover damages for emotional distress. *Fowler v. Carrollton Public Library,* 799 F.2d 976, 982 (5th Cir.1986); *Laje v. R.E. Thomason General Hosp.,* 665 F.2d 724, 728 (5th Cir.1982). Dr. Marin, testified that he suffered considerable emotional distress over this incident, affecting his physical health. His wife and children buttressed his testimony. However, in the case of the procedural violation, Dr. Marin is entitled only to damages for the emotional distress from the procedural irregularities and not from the actual withdrawal of obstetrical privileges. The evidence reflects that Dr. Marin's first notice of the adverse decision was somewhat traumatic, since he was advised by a nurse at the time that he was attempting to admit a patient in labor. He should also recover for the emotional distress over losing his major surgical privilges.

■ The Court finds that fair compensation for Defendant's damages would be the sum of $20,000.00. The Court further finds no basis to impose punitive damages on any Defendant. There is no evidence that any Defendant bore malice or ill will toward Dr. Marin. At worst, the evidence reflects a relatively small hospital in a modest-sized community, where a staff accustomed to handling internal problems on an informal basis blundered procedurally. Even the substantive blunder with respect to the major surgical privileges appears to have been inadvertent, at least in the sense that it evolved into a permanent decision.

*Parties Liable*

■ The final question is which Defendants are liable for the damages. Apart from the Hospital, the remaining Defend-

ants are Administrator David Brown; Board members Pitman, Albrecht, Coleman, Lack, Malik, and Velasquez; Dr. Richard C. Allen, Jr., Chief of Staff and Head of the Executive Committee; Dr. Luke Robinson of the OB–GYN Committee; and Drs. Koenig and Sawyers of the Credentials Committee. As this Court views the evidence, the critical error was committed at the Executive Committee level. Whether the process which affected Dr. Marin was "corrective action" under Article IX of the by-laws or was somehow a routine review of his credentials, the by-laws contemplate that Dr. Marin's right to notice and hearing would emanate from the Executive Committee. No procedural errors were committed below that level. The by-laws also contemplate that responsibility for the ultimate substantive decisions is borne first by the Executive Committee and then by the Board of Managers. The Administrator, of course, was charged with the overall responsibility of advising all committees, and the evidence is clear that the committees and the Board relied on the Administrator for guidance on the critical question of whether the proper procedures had been followed. The Plaintiff is entitled to damages against all remaining Defendants except Koenig, Sawyers and Robinson.