



# OPINION

No. 04-08-00428-CV

Arthur **MARLIN**, M.D.; Sarah J. Gaskill, M.D.;
and Pediatric Neurosurgery of South Texas, P.A.;
Appellants and Cross-Appellees

v.

Frank **ROBERTSON**, M.D.; Barry Cofer, M.D.; John Doski, M.D.; and Bexar County Pediatric
Surgery Associates, P.L.L.C.; Methodist Healthcare System of San Antonio, Ltd., L.L.P.;
Methodist Children's Hospital of South Texas; Children's Hospital Intensive Care Associates;
Mahendra Patel, M.D.; Dan Sedillo, M.D.; Kevin Browne, M.D.;South Texas Radiology Group,
P.A.; Joel Dunlap, M.D.; and Christus Santa Rosa Health Care Corp.;
Appellees and Cross-Appellants

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CI-03786
Honorable Karen H. Pozza, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Sandee Bryan Marion, Justice
    Rebecca Simmons, Justice
    Marialyn Barnard, Justice

Delivered and Filed: December 9, 2009

AFFIRMED

This is an appeal from summary judgments rendered in favor of the appellees who were the

defendants below.  We affirm.

# BACKGROUND

Arthur Marlin and Sarah Gaskill (collectively, "the plaintiffs") are board-certified pediatric neurosurgeons who practiced at Methodist Children's Hospital of South Texas ("Methodist Children's) in San Antonio for years. Marlin was the hospital's CEO from October 1998 through March 2003. In the summer of 2003, Marlin and Gaskill began to move their practice to North Central Baptist Hospital ("North Central Baptist"). In December 2003, Gaskill resigned her Methodist Children's privileges and Marlin took a leave of absence; they both, however, continued to practice at North Central Baptist. In August 2004, Marlin applied to Methodist Children's for reinstatement of his privileges, but later withdrew his application. Gaskill and Marlin also had privileges at Christus Santa Rosa Health Care ("Christus") until Gaskill resigned in 2001 and Marlin resigned in 2000. In July 2004, both re-applied to Christus for their privileges, but later withdrew the applications. In November 2004, Marlin and Gaskill closed their practice at North Central Baptist. In March 2005, they closed their practice in San Antonio and moved to Florida, where they teach and practice pediatric neurosurgery at the University of South Florida.

The plaintiffs sued all defendants for violations of the Texas Free Enterprise and Antitrust Act ("Texas Antitrust Act"), libel, slander, business disparagement, tortious interference with business and prospective advantage, and intentional infliction of mental anguish. In large part, these claims arise from the plaintiffs' allegations that the defendant-hospitals' peer review or administrative review process ultimately resulted in the plaintiffs' applications for reinstatement at Methodist Children's and for privileges at Christus being denied. The plaintiffs also alleged, in addition to these claims, a breach of contract claim against Methodist Healthcare System of San

Antonio ("MHS"). Finally, the plaintiffs alleged MHS violated their due process rights based on malicious and sham peer review. All defendants counterclaimed for attorney's fees, costs, and sanctions.

All defendants separately moved for summary judgment, and the plaintiffs filed a consolidated response. On December 20, 2007, the plaintiffs non-suited their claims for libel, slander, defamation, and business disparagement. On January 11, 2008, the trial court first considered the defendants' motions for summary judgment on plaintiffs' affirmative claims, ultimately sustaining defendants' objections to plaintiffs' summary judgment evidence and granting the defendants' motions for summary judgment. On May 22, 2008, the trial court considered the defendants' counterclaims for fees and costs, ultimately overruling defendants' objections to plaintiffs' summary judgment evidence and rendering a take-nothing judgment against all defendants. Also on May 22, 2008, the trial court signed a final judgment (1) concluding the nonsuit was effective and dismissing with prejudice the plaintiffs' claims for libel, slander, defamation, and business disparagement; (2) ordering plaintiffs to take nothing on their claims; and (3) ordering that defendants were not entitled to recover fees or costs on their respective counterclaims.

All parties appealed. The plaintiffs appeal the take-nothing summary judgment rendered against them on their antitrust and breach of contract claims.[1] The defendants appeal the take-nothing judgment against them on their counterclaim for fees and costs.

---

[1] Plaintiffs do not challenge the summary judgment rendered against them on their due process violation claims. Therefore, the trial court's take-nothing judgment as to that claim is affirmed without further discussion.

## THE PLAINTIFFS' STANDING TO BRING THEIR ANTITRUST CLAIMS

Antitrust law imposes a threshold standing requirement upon persons seeking liability for antitrust violations. *See Bowen v. Wohl Shoe Co.*, 389 F. Supp. 572, 578 (S.D. Tex. 1975); *Scott v. Galusha*, 890 S.W.2d 945, 950 (Tex. App.—Fort Worth 1994, writ denied). "Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991). "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Id.* Standing to bring an antitrust claim is a question of law. *Roberts v. Whitfill*, 191 S.W.3d 348, 354-55 (Tex. App.—Waco 2006, no pet.). Standing to pursue an antitrust suit exists if the plaintiff shows the following: (1) injury-in-fact, which is an injury to the plaintiff proximately caused by the defendant's conduct; (2) antitrust injury; and (3) proper plaintiff status, which assures that other parties are not better situated to bring suit. *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997); *see also Todorov,* 921 F.2d at 1449.[2]

In their motions for summary judgment on the issue of whether the plaintiffs had standing to bring their claims, none of the defendants challenged the first element of antitrust standing, *i.e.*, whether the plaintiffs established an injury-in-fact. Only Christus challenged the third element, *i.e.*, plaintiff status. However, because all defendants challenged the second element, *i.e.*, antitrust injury, we begin with a discussion of that element.

---

[2] The Texas Antitrust Act is modeled on both the Sherman Antitrust Act and the Clayton Act. *Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992). The Texas Antitrust Act provides that it is to be interpreted "in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose." TEX. BUS. & COM. CODE ANN. § 15.04 (Vernon 2002). Therefore, it is appropriate that we look to federal case law for guidance.

An antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 97 S. Ct. 690, 697 (1977); *Roberts*, 191 S.W.3d at 355. Antitrust laws are designed to protect competition rather than individual competitors. *See* TEX. BUS. & COM. CODE ANN. § 15.04 (Vernon 2002); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991). Therefore, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp.*, 97 S. Ct. at 697. "It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Id.* "This limitation is essential because it 'requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation . . . increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.'" *Todorov*, 921 F.2d at 1449-50 (citation omitted).

The defendants all argued that whether a plaintiff has established an antitrust injury for standing purposes must be viewed from the consumer's viewpoint. According to the defendants, the plaintiffs were required to show that the defendants' conduct affected the prices, quantity, or quality of a specific product within a relevant market. However, we believe the defendants' analysis confuses the distinction between antitrust injury for standing purposes and "the merits-related perspective of the impact of a defendant's conduct on overall competition."[3] *Doctor's Hosp.*, 123

---

[3] The confusion arises from cases that use the phrase "antitrust injury" in the context of a discussion of standing as well in the context of a discussion of the merits of a plaintiff's antitrust claim. *See, e.g., Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3rd Cir. 1996) (in analyzing merits of antitrust claim, and not standing, court held analysis of "antitrust injury" must be from consumer's viewpoint); *Oksanen*, 945 F.2d at 708 (in analyzing merits of antitrust claim, and not standing, court held antitrust plaintiff held burden of proving concerted action caused "antitrust injury" by imposing unreasonable restraint on trade).

F.3d at 305. In *Doctor's Hospital,* the Fifth Circuit discussed the type of proof a plaintiff needed to produce in order to show that he suffered an antitrust injury for purposes of standing. The court held that "the antitrust laws do not require a plaintiff to establish a market-wide injury to competition," which often is a component of substantive liability, "as an element of standing." *Id.* "To require summary judgment proof of the substantive violations as a prerequisite to antitrust injury and therefore standing to sue . . . is inefficient and confusing." *Id.* at 306. The court instead held that "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace. . . ." *Id.* at 305. The court explained as follows:

> When a court concludes that no violation has occurred, it has no occasion to consider standing . . . . An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government—which enjoys automatic standing—must be dismissed.

*Id.* at 306 (quoting *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996)); *accord Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 n.2 (3rd Cir. 1999) (holding district court erred by incorporating issue of anticompetitive market effect into its standing analysis, "confusing antitrust injury with an element of a claim under section 1 of the Sherman Act" and stating district court's approach may have been result of the similar "antitrust injury" label applied to injury component of antitrust standing analysis and to marketplace harm element under section 1.).

Because the defendants' analysis too narrowly focused on injury as a component of substantive liability, rather than as an element of standing, we conclude the defendants did not establish their entitlement to summary judgment as a matter of law on the issue of standing. Therefore, we next address whether the plaintiffs raised a fact issue on the existence of any anticompetitive effect resulting from the defendants' behavior.[4]

**MERITS OF PLAINTIFFS' ANTITRUST CLAIMS**

The Texas Antitrust Act provides, in relevant part, that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful," and that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." TEX. BUS. & COM. CODE ANN. § 15.05(a), (b) (Vernon 2002 ). The plaintiffs alleged conspiracy in restraint of free trade under subsection (a) and monopolization of or attempts to monopolize the practice of pediatric neurosurgery in Bexar County, Texas under subsection (b).

In their various motions for a traditional summary judgment, all defendants argued the plaintiffs' claims fail as a matter of law because there was no antitrust injury to the Bexar County pediatric market. The defendants alleged the plaintiffs' departure from Methodist Children's, and later San Antonio and Bexar County, was caused by the plaintiffs themselves and not by any conduct on the part of the defendants. The defendants relied on their contention that the plaintiffs' privileges were never terminated, revoked, suspended, or denied; instead, defendants asserted (1) Gaskill

---

[4] In examining whether the defendants were entitled to summary judgment as a matter of law on the merits of plaintiffs' claims, we examined all evidence cited to by the plaintiffs in their consolidated response without regard to the admissibility of the evidence. Therefore, because we assume for the purpose of this appeal that the defendants' objections to the plaintiffs' evidence should have been denied and because we reviewed all evidence in the light most favorable to the plaintiffs, we do not reach the plaintiffs' first four issues on appeal, all of which dealt with the trial court's evidentiary rulings.

resigned, Marlin took a leave of absence from Methodist Children's, and Marlin later withdrew his application for reinstatement of privileges at Methodist Children's; (2) both plaintiffs decided to leave North Central Baptist because the hospital began terminating support services needed for pediatric neurosurgery;[5] and (3) they both withdrew their re-applications for privileges at Christus. The defendants also alleged the plaintiffs could not show that any restraint on competition affected the prices, quantity, or quality of pediatric neurosurgery services in Bexar County.

## A.      Section 15.05(a) Violation: Use of Peer Review Process & Interference with Patients

To establish that a defendant contracted, combined, or conspired in restraint of trade in violation of section 15.05(a), a plaintiff must show that the alleged contract, combination, or conspiracy is unreasonable and has an adverse effect on competition in the relevant market. *See Winston v. Am. Med. Int'l,* 930 S.W.2d 945, 951-52 (Tex. App.—Houston [1st Dist.] 1996, writ denied). The Texas Antitrust Act does not prohibit all restraints of trade; instead, it prohibits only those that restrain trade unreasonably. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990). When assessing the reasonableness of a restraint on trade, courts look to one of two categories of "contracts, combinations, or conspiracies." The first category is restrictive practices whose "nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal per se.'" *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 98 S. Ct. 1355, 1365 (1978). The second category is restrictive practices whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons for its imposition. *Id.* For this category, courts apply the "rule of

---

[5] The plaintiffs alleged no complaints against North Central Baptist in the underlying lawsuit.

reason" under which the fact-finder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 97 S. Ct. 2549, 2557 (1977). We examine each category in turn.

### 1. Per se violation

A per se analysis is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason. *Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2713 (2007). Thus, courts have been "slow to condemn rules adopted by professional associations as unreasonable per se and, in general, to extend per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *F.T.C. v. Indiana Fed'n of Dentists*, 106 S. Ct. 2009, 2018 (1986) (citations omitted) (holding that "category of restraints classed as group boycotts is not to be expanded indiscriminately").

In their consolidated summary judgment response, the plaintiffs alleged the defendants "engineered a boycott of plaintiffs' North Central Baptist practice with Methodist Children's itself instructing its emergency room physicians *not* to refer patients to plaintiffs' practice at North Central Baptist, and even going so far as to send a memo instructing its staff to refer any patients to Drs. Tullous and Mancuso at [Christus]." Plaintiffs also alleged that when plaintiffs' patients called Methodist Children's seeking care, they were not referred to plaintiffs' new practice at North Central Baptist. Plaintiffs allege the purpose of the boycott was for the financial benefit of defendants.

Plaintiffs alleged a per se boycott whereby defendants "cut off access to a supply, facility or market necessary to enable plaintiffs to compete." The plaintiffs also alleged defendants, individually and in combination, "directly interfered with plaintiffs' existing and potential patients, which has independently been held to constitute an unlawful agreement to restrain trade *even if* competition is not entirely driven out of the market."

Group boycotts are a type of economic activity that merits per se invalidation under antitrust laws. *NW. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 105 S. Ct. 2613, 2619 (1985). However, assuming the defendants did, in fact, engage in a group boycott, a group boycott is not always a per se violation. Merely alleging a group boycott is not sufficient because not all group boycotts are predominantly anticompetitive. *Id.* at 2621. The per se rule generally applies in cases in which firms with market power boycott suppliers or customers for the purpose of discouraging them from doing business with a competitor. *Indiana Fed'n of Dentists,* 106 S. Ct. at 2018. In *Goss v. Memorial Hospital System,* the Fifth Circuit declined to apply the *per se* rule to a physician's claim that the hospital for which he worked and its medical staff conspired to deprive him of his staff privileges. 789 F.2d 353, 355-56 (5th Cir. 1986). The court held that finding a restraint to be unreasonable as a matter of law was inappropriate in a case where the plaintiff had failed to show that the hospital had "'market power or exclusive access to an element essential to effective competition . . . .'" *Id.* at 355 (quoting *NW. Wholesale Stationers,* 105 S. Ct. at 2620-21). The court also noted that the plaintiff's "challenged expulsion from the staffs of [two hospitals] through the use of the hospitals' internal review procedure [did] not imply anticompetitive state of

mind" because such review procedures are "necessary to insure that hospital staff members are competent medical practitioners." *Id.*

Here, the plaintiffs' summary judgment evidence consists of their own depositions, in which they contend Methodist Children's stopped sending them patients or referred patients to other doctors and instructed the emergency room not to call them. Even if the plaintiffs' allegations that Methodist Children's stopped referring patients to them are true, we conclude their claims should be evaluated under the rule of reason, and not as a per se violation, because courts have generally been reluctant to

> hold that a group of physicians who decide that they do not want to refer patients to a particular surgeon, because they doubt his qualifications, have committed a per se violation of the Sherman Act. Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for patients' well-being . . . such behavior, in the medical service industry, should be analyzed in terms of the rule of reason.

*Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1370 (W.D. Pa. 1982); *see also Jackson v. Radcliffe*, 795 F. Supp. 197, 205 (S.D. Tex. 1992) (applying rule of reason to physician's contention that termination of his contract with hospital was illegal restraint of trade); *Oksanen*, 945 F.2d at 708-09 (analyzing denial or revocation of medical staff privileges under rule of reason); *Marin v. Citizens Mem'l Hosp.*, 700 F. Supp. 354, 360 (S.D. Tex. 1988) (applying rule of reason to physician's claim that hospital for which he worked and its medical staff formed group boycott to reduce or eliminate his competitive potential).

### 2. Rule of Reason

To establish a violation under the rule of reason, a plaintiff must prove the restrictive practice has an adverse effect on competition in the relevant market. *DeSantis*, 793 S.W.2d at 688. "Rule

of reason analysis tests the effect of a restraint of trade on *competition*." *Id.* As a result, a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury. *Oksanen*, 945 F.2d at 708. For example, the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. *Id.* "If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action." *Id.* "To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Id.*

To meet this burden, a plaintiff must prove what market it contends was restrained and that the defendants played a significant role in the relevant market. *Id.* at 709. Absent this market power, any restraint on trade created by the defendants' actions is unlikely to implicate Texas Antitrust Act section 15.05(a). *See id.* "There must be evidence of 'demonstrable economic effect' not just an inference of *possible* effect." *Coca-Cola Co. v. Harmer Bottling Co.*, 218 S.W.3d 671, 689 (Tex. 2006).

In their consolidated response, the plaintiffs asserted they were driven from the "market" by an "improper" use of the peer review process, and they alleged the denial of their applications for reinstatement of their privileges was a rule of reason violation under section 15.05(a). The plaintiffs relied on their own affidavits and deposition testimony, as well as a report submitted by Dr. L.R. Huntoon on "sham peer review." Marlin asserted he resigned his position as CEO of Methodist Children's "under pressure as a result of the complaints pursued by the Defendant doctors and the administration of Methodist Healthcare System." He alleged all the defendant-doctors, with one

exception, threatened to resign if he was not removed as CEO. He also alleged he was accused of hiding medical complications in his cases, and his request for a four-year review of his charts for the purpose of clearing his name and reputation was denied. According to Marlin, Gaskill's "forced" resignation left him with no choice but to take a leave of absence because he was unable to provide the required backup for emergency and on-call coverage. When he asked for help finding such backup, he was refused help. When he ultimately found backup help and took steps to end his leave of absence and return to full staff privileges, Methodist Children's informed him he would need to reapply for credentialing. Marlin contended he withdrew his requests for reinstatement of his privileges because he was threatened with "being reported to the National Practitioner Data Bank due to a denial of credentials."[6] Marlin also asserted that his and Gaskill's applications for privileges at Christus "were in jeopardy of being denied" and with that denial "there was the threat and probability of being reported to the National Practitioner Data Bank." For this reason, they withdrew their applications. The plaintiffs also alleged the defendants gained financially from the plaintiffs' ouster from Bexar County. According to plaintiffs, it made economic sense for the defendants to replace the plaintiffs with other doctors the defendants could more easily control.

---

[6] The granting or retention of a doctor's hospital privileges is a process known as "credentialing." *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997). Hospitals and physicians are not only encouraged to report professional incompetence on the part of other doctors, but in some instances, they are *required* to report it. Under the federal Health Care Quality Improvement Act ("HCQIA") of 1986, a health care entity must report to the state board of medical examiners any professional review action that adversely affects the clinical privileges of a physician. *See* 42 U.S.C. § 11133(a)(1). This information is then forwarded by the state board to the National Practitioner Data Bank. *See id.* § 11133(b). Upon request, the data bank must provide the adverse action information it receives to state licensing boards, hospitals, and other organizations that have entered into, or may be entering into, an employment or affiliation relationship with the subject physician or to which the physician has applied for clinical privileges or appointment to the staff. *Id.* § 11137(a). The HCQIA requires this information be kept confidential by the recipient, and any breach of confidentiality is subject to a civil monetary penalty. *Id.* § 11137(b).

As to effect on the market, the plaintiffs alleged the relevant product market was for pediatric neurosurgery services, and the relevant geographic market was in and around San Antonio. The plaintiffs argued that defendants' actions "were antithetical to the welfare of consumers of pediatric neurosurgery services by damaging the free market's 'allocative efficiency' and causing a decrease in the quality of services available by restricting consumers to non-board certified physicians who would not even always be available to treat them." In their affidavits, both plaintiffs stated that other doctors, surgeons, and neurosurgeons "are not interchangeable with pediatric neurosurgeons, thus, the realities are that [their] patients could not easily switch to other surgeons . . . ." In support of this argument, the plaintiffs alleged that only twelve physicians in all of Texas practice pediatric neurosurgery and only at certain hospitals, with two of these hospitals located in San Antonio (Methodist Children's and Christus). The plaintiffs also alleged that after they left Bexar County, only two neurosurgeons practicing pediatric neurosurgery remained in the market, Drs. Tullous and Mancuso at Christus, neither of whom are board certified in pediatric neurosurgery. However, Marlin admitted at his deposition that pediatric neurosurgery is part of a general neurosurgeon's training and the Board of Neurological Surgeons considers general neurosurgeons qualified to perform pediatric neurosurgery.

Although plaintiffs argued that quality of care was diminished because patients were restricted to physicians not board-certified in pediatric neurosurgery and who were not always available to treat them, the plaintiffs did not contend prices for pediatric neurosurgery services would increase over the competitive level; no evidence was offered that pediatric patients were unable to obtain necessary services in Bexar County; and no evidence was offered to support the plaintiffs'

speculation that the welfare of consumers of pediatric neurosurgery services was damaged, that there was a decrease in the quality of services available, that the cost of pediatric neurosurgery has risen, or that the hospitals have raised their rates or changed their behavior in any anti-competitive way.

We conclude the plaintiffs' section 15.05(a) antitrust claims fail as a matter of law because they failed to carry their burden of submitting summary judgment proof sufficient to raise a fact issue on whether defendants' alleged actions had an adverse effect on competition in the relevant market.

**B.      Section 15.05(b) Violation: Monopolization or Attempted Monopolization**

The Texas Antitrust Act prohibits monopolies or attempts to monopolize. TEX. BUS. & COM. CODE ANN. § 15.05(b).  However, merely possessing a monopoly or market power is not forbidden. *Chromalloy Gas Turbine Corp. v. United Techs. Corp.*, 9 S.W.3d 324, 327 (Tex. App.—San Antonio 1999, pet. denied).  Moreover, the prohibition against attempted monopoly does not encompass all efforts to acquire market power.  *Id.*  For example, the Act was not intended to protect against increasing competition.  *Id.*

To establish that a defendant monopolized in violation of section 15.05(b), a plaintiff must show (1) the defendant's possession of monopoly power in the relevant market and (2) the defendant's willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. *Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992).  To establish attempted monopolization, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc., v. McQuillan,* 113 S. Ct. 884, 890-91 (1993).

The first element of an attempted monopolization claim considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate "ability to lessen or destroy competition in that market." *Id.* at 891. Therefore, "[t]he difference between actual monopoly and attempted monopoly rests in the requisite intent and the necessary level of monopoly power." *Chromalloy Gas Turbine*, 9 S.W.3d at 327. Monopoly power is "the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir. 1985). Such predatory conduct is conduct that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power. *Taylor Publ'n Co. v. Jostens, Inc.*, 216 F.3d 465, 475-76 (5th Cir. 2000).

The plaintiffs contend, and for the purpose of this appeal we assume, the relevant market is pediatric neurosurgery. We first note that none of the defendant-doctors are pediatric neurosurgeons.[7] Nevertheless, in their consolidated response, the plaintiffs alleged the elements of

---

[7] To support their argument that there was no anticompetitive affect, the defendants rely on a "document" they allege the plaintiffs provided to the Department of Justice, which states as follows:

STRUCTURE OF PEDIATRIC NEUROSURGERY IN SAN ANTONIO

Interestingly, Manhattan has only 4 board certified pediatric neurosurgeons with a significantly greater population.
*The children of San Antonio could be easily served by 2 pediatric neurosurgeons in terms of volume of cases.* Call coverage then becomes the only issue. We have provided 24/7 call coverage between the two of us for 10 years. [Emphasis added.]

The problem with this "document" is that it is attached to the Methodist Defendants' brief in support of their counterclaims, and it does not appear to have been included in the summary judgment proof offered by any of the defendants. Therefore, we do not consider this document on appeal.

monopolization, or a dangerous probability of monopolization, was shown by evidence that the defendant-doctors increased their business in the relevant market. According to the plaintiffs, the defendant-doctors worked to eliminate them from their practice, which then left only Tullous and Mancuso at Christus and "cleared the way for Methodist to hire its own [doctor, Gennuso]—thus 'monopolizing the care among the two hospitals, among the three (captive) neurosurgeons, so that all pediatric neurosurgery is now done by hospital-employed physicians.'" In support of this contention, the plaintiffs relied on the following testimony at Marlin's deposition:

> Q. [Y]ou also accuse the Defendant Doctors of monopolizing and inhibiting competition for pediatric neurosurgery services in the San Antonio area. How—explain that. How could any of these doctors . . . monopolize and inhibit competition of pediatric neurosurgery in San Antonio?

> A. They did it as a group. They eliminated two pediatric neurosurgeons from practice in the city, which left only basically two others that worked for [Christus] which let Methodist [Children's] hire one part of CHICA, thus monopolizing the—the care among the two hospitals, among the three neurosurgeons, so that all pediatric neurosurgery is now done by hospital-employed physicians.

We do not believe the evidence that the defendant-hospitals elected to hire or grant privileges to Tullous, Mancuso, and Gennuso creates a genuine issue of material fact about whether any of the defendants possessed monopoly power in the relevant market. Nor does the fact that the three remaining pediatric neurosurgeons worked at the two defendant-hospitals create a genuine issue of material fact about whether any of the defendants had a dangerous probability of achieving monopoly power. Even if the hospitals chose to engage the services of hospital-employed physicians, this aspect of the defendants' behavior is consistent with competition. Further, "[h]iring talent cannot generally be held exclusionary even if it does weaken actual or potential rivals and

strengthen a monopolist . . . [because] there is a high social and personal interest in maintaining a freely functioning market for talent." *Taylor Pub. Co.*, 216 F.3d at 479 (citation omitted). Also, other than their contention that they were "run out of business," the plaintiffs offered no evidence indicating the defendants prevented other pediatric neurosurgeons from entering the relevant market.

We conclude the plaintiffs' section 15.05(b) antitrust claims fail as a matter of law because they failed to carry their burden of submitting summary judgment proof sufficient to raise a fact issue on any of the elements of the claim.

## THE PLAINTIFFS' BREACH OF CONTRACT CLAIM

The plaintiffs alleged a breach of contract claim only against MHS. The plaintiffs asserted MHS's actions breached the Methodist Children's Medical Staff Bylaws ("the Medical Staff Bylaws"). In their petition, the plaintiffs argued the Medical Staff Bylaws and the Bylaws Governing the Community Board of Methodist Healthcare System of San Antonio, Ltd. ("the Hospital Bylaws"), taken together, afford contractual due process rights to the Methodist Children's medical staff. MHS moved for summary judgment on the grounds that the Medical Staff Bylaws did not create a contract between MHS and the plaintiffs. The plaintiffs countered, in their consolidated response, that although the Medical Staff Bylaws may not create contractual rights, such rights were created by the Hospital Bylaws.

The plaintiffs are correct that procedural rights established in *hospital* bylaws can constitute contractual rights. *See Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 887 (Tex. App.—Dallas 2000, no pet.); *Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436, 439 (Tex. App.—Texarkana 1994, writ denied). But rights created by *medical staff* bylaws are not necessarily

binding on a hospital. *Stephan*, 20 S.W.3d at 887; *see also Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895, 897 (Tex. Civ. App.—Waco 1962, writ ref'd n.r.e.). Medical staff bylaws that do not define or limit the power of a hospital as it acts through its governing board do not create contractual obligations for the hospital. *Stephan*, 20 S.W.3d at 888; *Powell v. Brownwood Reg'l Hosp., Inc.*, No. 11-03-00171-CV, 2004 WL 2002929, at *3 (Tex. App.—Eastland Sept. 9, 2004, pet. denied).

The plaintiffs' allegations regarding MHS's breach of an alleged contract arise from how they were treated when they attempted to reapply for privileges at Methodist Children's and how Gaskill was treated in the peer review process. These claims are governed by the Medical Staff Bylaws and the Credentials Manual and Fair Hearing Plan ("Credentials Manual"). Therefore, we determine whether the Medical Staff Bylaws define or limit MHS's power to act through its governing board.[8]

The Hospital Bylaws provide that the "hospital," defined to include Methodist Children's, is owned by MHS, and MHS "retains all authority and control over the business, policies, operations, and assets of the" hospital via the MHS Board of Governors. Pursuant to the Hospital Bylaws, the "MHS Board of Governors has delegated certain duties to the MHS Officers and to [the] Community Board." The Hospital Bylaws define the Community Board as the hospital's "local governing body." The "rights and duties delegated to the Community Board, acting in its capacity as the authorized agent of MHS, are described in" the Hospital Bylaws, which charge the Community Board with "establish[ing] and defin[ing] the structures of an organized Medical Staff composed of qualified physicians . . . ." The Hospital Bylaws also state as follows:

---

[8] The plaintiffs contend this case is "exactly the same" as the case considered by the Texarkana court in *Gonzalez*, in which that court held the procedural rights under the hospital's bylaws were contractual. 880 S.W.2d at 439. We disagree because here the contractual rights claimed to have been breached arise not from the Hospital Bylaws, but instead, from the Medical Staff Bylaws.

The MHS Board of Governors has appointed the Community Board . . . to assist and advise the MHS President/CEO, the Partnership,[9] the MHS Board of Governors, and the Medical Staff. The primary function of the Community Board shall be to assure that the [hospital] and its Medical Staff provide quality medical care that meets the needs of the community. For this purpose, the MHS Board of Governors has delegated to the Community Board the authority to receive and evaluate periodic reports from the Medical Staff and its officers, to make decisions in compliance with the Partnership's policies regarding Medical Staff appointments, reappointments, and the granting of clinical privileges, to oversee performance improvement, utilization review, risk management, and similar matters regarding the provision of quality patient care at the [hospital], and to establish policies regarding such matters. . . . .

The MHS Board of Governors . . . retains authority for the [hospital's] business decisions and financial management . . . . The MHS Board of Governors expressly reserves the right to amend, modify, rescind, clarify, or terminate at any time and without notice any delegation of authority given to the Community Board and, if deemed necessary by the MHS Board of Governors, to override decisions made by the Community Board.

The Hospital Bylaws also charge the Medical Staff with "adopt[ing] and maintain[ing] current Bylaws, Rules and Regulations . . . establishing a framework for self-governance within which Medial Staff members can act with a reasonable degree of freedom and confidence, while remaining acceptable to the Board." However, the Community Board "shall maintain complete responsibility and authority over the operation of the Medical Staff." The Medical Staff Bylaws are required to "contain certain procedures to provide a fair hearing and appeal process for an applicant to, or member of, the Medical Staff or other individuals applying for, or holding clinical privileges, who may be subject to an adverse decision regarding his/her appointment, reappointment, continued appointment to the Medical Staff and/or exercise of privileges granted or requested." In the Medical

---

[9] The hospital bylaws define the "Partnership" as the "The legal owner of the Hospital, the Methodist Healthcare System of San Antonio, Ltd., L.L.P. . . . ."

Staff Bylaws, the medical staff "recogniz[ed] that it must assume . . . responsibility [for the medical care rendered in the hospital of MHS] subject to the ultimate authority of the Board of Governors."

The Credentials Manual was created "pursuant to and under the authority of the Medical Staff Bylaws . . . ." The Credentials Manual was "subject to approval and amendment by the Community Board upon recommendation of the Medical Board[,]" which was "empowered to represent and act for the Medical Staff." One of the purposes of the Credentials Manual was to "serve as a primary means for accountability to the Community Board concerning professional performance of Practitioners and others with clinical privileges authorized to practice at the Hospital . . . . [and to] provide a mechanism for recommending to the Community Board the appointment and reappointment of qualified Practitioners and making recommendations regarding clinical privileges for qualified and competent Healthcare Professionals."

We conclude the Medical Staff Bylaws do not attempt to define or limit MHS's power to act through its Board of Governors because "[t]he MHS Board of Governors expressly reserves the right[,] if deemed necessary by the MHS Board of Governors, to override decisions made by the Community Board." Accordingly, because the Medical Staff Bylaws do not define or limit the power of MHS as it acts through its governing board, neither the Medical Staff Bylaws, nor the Credentials Manual created pursuant to those bylaws, give rise to contractual rights. Therefore, the trial court properly rendered summary judgment in favor of the MHS because, as matter of law, no contract existed between MHS and the plaintiffs.

### THE DEFENDANTS' COUNTERCLAIMS

All defendants asserted counterclaims for attorney's fees and costs pursuant to three statutes. They asserted they were entitled to attorney's fees under the federal Health Care Quality Improvement Act ("HCQIA") of 1986, pursuant to which "the court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith." 42 U.S.C. § 11113. The defendants also asserted they were entitled to attorney's fees under the Texas Medical Practice Act ("TMPA"), pursuant to which "a defendant subject to this section may file a counterclaim in a pending action . . . to recover defense costs, including court costs, attorney's fees, and damages incurred as a result of the civil action, if the plaintiff's original action is determined to be frivolous or brought in bad faith." TEX. OCC. CODE ANN. § 160.008(c) (Vernon 2004). Finally, the defendants asserted they were entitled to attorney's fees under the Texas Antitrust Act, pursuant to which "[o]n a finding by the court that an action under this section was groundless and brought in bad faith or for the purpose of harassment, the court shall award to the . . . defendants a reasonable attorney's fee, court costs, and other reasonable expenses of litigation." TEX. BUS. & COM. CODE ANN. § 15.21(a)(3).

We review a trial court's decision regarding the award of attorney fees and costs for an abuse of discretion. *See Muzquiz v. W.A. Foote Mem'l Hosp., Inc.*, 70 F.3d 422, 432 (6th Cir. 1995) (HCQIA case); *Smith v. Ricks*, 31 F.3d 1478, 1487 (9th Cir. 1994) (HCQIA case); *Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 735 Tex. App.—Corpus Christi-

Edinburg 2005, pet. denied) (Texas Antitrust case); *Dallas County Med. Soc'y v. Ubinas Brache*, 68 S.W.3d 31, 44 (Tex. App.—Dallas 2001, pet. denied) (HCQIA case).  An action is frivolous "if it lacks an arguable basis either in law or fact." *Jeung v. McKrow*, 264 F. Supp. 2d 557, 574-75 (E.D. Mich. 2003) (HCQIA case).  Similarly, a claim is groundless if it has no basis in law or fact and is not warranted by good faith argument for extension, modification, or reversal of existing law. *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634, 637 (Tex. 1989).  To find that a lawsuit was brought in "bad faith," a defendant must show that the suit was motivated by a malicious or discriminatory purpose. *Riddick v. Quail Harbor Condo. Ass'n, Inc.*, 7 S.W.3d 663, 677 (Tex. App.—Houston [14th Dist.] 1999, no pet.).  In applying these criteria, the United State Supreme Court provided the following caveat:

> [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.  This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.  No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable.  Decisive facts may not emerge until discovery or trial.  The law may change or clarify in the midst of litigation.  Even when the law or the facts appear questionable or unfavorable at the outset a party may have an entirely reasonable ground for bringing suit.

*Christiansburg Garment Co. v. EEOC*, 98 S. Ct. 694, 700-01 (1978).

With this caveat in mind and after careful review of the record, we conclude the trial court did not abuse its discretion in impliedly ruling that the plaintiffs' claims were not frivolous, unreasonable, without foundation, groundless, or brought in bad faith or for the purpose of harassment.  All defendants initially argued the plaintiffs' antitrust claims were frivolous, unreasonable, without foundation, and brought in bad faith based on the immunity provided by

HCQIA and TMPA. But, not all of the plaintiffs' claims relied upon actions allegedly taken in the context of a peer review or medical committee; therefore, any immunity under HCQIA and TMPA did not entirely shield the defendants from liability. *See Austin v. McNamara*, 979 F.2d 728, 738 (9th Cir. 1992) (holding that allegations of refusal to provide coverage and that other physicians "openly attacked [plaintiff-doctors] before nurses and in neurosurgical group meetings" "cannot be brought within HCQIA's immunity"); *Jeung*, 264 F. Supp. 2d at 574 (holding that statute "does not purport to confer immunity for actions unrelated to review process").

Also, because we cannot conclude the plaintiffs knew the defendants were immune at the outset of the litigation; we cannot say their challenge to the defendants' immunity was not legitimate. *See Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 473 (6th Cir. 2003) (holding "it was not unreasonable, frivolous, without foundation, or in bad faith for plaintiffs to oppose the LMH Defendants' position on HCQIA immunity [because] Plaintiffs had valid questions concerning the manner in which the LMH Defendants conducted the professional review of Dr. Robert Meyers and chose to resolve those issues in this Court"); *Leak v. Grant Med. Ctr.*, 893 F. Supp. 757, 763 (S.D. Ohio 1995), *aff,d* 103 F.3d 129 (6th Cir. 1996) (noting there is no "*per se* rule that a healthcare professional could never have standing to asserts antitrust claims arising from the denial of staff privileges"). Moreover, the fact that several of the plaintiffs' claims either lacked sufficient evidence to go forward or were determined to be precluded by legal precedent does not mean that those claims were groundless or completely without foundation. *See Hughes v. Rowe*, 101 S. Ct. 173, 179 (1980) ("Allegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, 'groundless' or 'without foundation' as required by *Christiansburg*."). Finally,

the case law governing the circumstances under which physicians may bring antitrust suits is not so well-settled that we can say the plaintiffs' suit was inconsistent with the Texas statute or applicable state and federal case law, and therefore, lacked a basis in law.

Accordingly, although the plaintiffs did not carry their summary judgment burden with regard to the merits of their antitrust claims, we will not engage in *post hoc* reasoning by concluding that, because they did not ultimately prevail, their claims must have been unreasonable or without foundation. Therefore, we conclude the trial court did not abuse its discretion in determining the plaintiffs' claims were not frivolous, unreasonable, without foundation, or brought in bad faith. *See Leak*, 893 F. Supp. at 762 ("We begin with the general proposition that the health care profession is not immune from scrutiny under federal antitrust laws.").

Finally, defendants argued the plaintiffs' conduct warranted fees under HCQIA because the plaintiffs filed "kitchen sink" pleadings asserting a variety of causes of action, many of which were nonsuited prior to the summary judgment hearing. Over the several years this litigation remained pending, defendants did not move for sanctions against the plaintiffs based upon their conduct, such as for the filing of a frivolous pleading, for discovery abuse, or for any other reason. Therefore, after a complete review of the record, we conclude the trial court did not abuse its discretion in determining the plaintiffs' conduct did not warrant an award of attorney's fees.

## CONCLUSION

For these reasons, we overrule all issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice