

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00106-CV

Barry **BROOKS**, Heston C. King, Stefen Douglas Brooks, Johanna Barton,
and Jesse Rodriguez Benavides,
Appellants

v.

**EXCELLENCE MORTGAGE, LTD.**,
Appellee

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-CI-01173
Honorable Peter A. Sakai, Judge Presiding

Opinion by:     Patricia O. Alvarez, Justice

Sitting:        Catherine Stone, Chief Justice
                Marialyn Barnard, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed:  May 30, 2014

AFFIRMED

In 2010, Appellants Barry Brooks, Heston C. King, Stefen Douglas Brooks, and Jesse

Rodriguez Benavides (collectively Brooks Appellants) left their employment at Appellee

Excellence Mortgage, Ltd.  Several days before their departure, Appellant Johanna Barton's

employment was terminated by Excellence.  After Appellants began work for Premier Nationwide

Lending, Excellence filed suit seeking injunctive relief, inter alia, to prevent Appellants from using

Excellence's confidential information to contact Excellence customers.

Appellants filed a counterclaim seeking commissions for loans that closed after they left Excellence's employment. Appellants asserted various claims, including interference with prospective business relations and an antitrust violation under the Texas Business and Commerce Code. Excellence sought summary judgment on each claim and Appellants filed a cross-motion for partial summary judgment.

The trial court granted summary judgment in favor of Excellence and denied all relief sought by Appellants. We affirm the trial court's order.

### FACTUAL BACKGROUND

Appellants worked as loan officers for Excellence Mortgage during 2010. Presumably all of the appellants signed an employment agreement, employee confidentiality agreement, and a production personnel compensation plan.[1] In September of 2010, the owners of Excellence began the process of restructuring the company. The restructuring included discussions with Georgetown Mortgage, LLC and ultimately the creation of a new entity, MG Mortgage.

During the last week of September 2010, Excellence loan officers underwent training provided by a corporate trainer from Georgetown. Although no actual compensation or benefits were discussed, the Brooks Appellants contend the new terms of their *possible* employment at Georgetown were much less favorable than at Excellence. The Brooks Appellants each decided employment at Georgetown was not acceptable.

### A. Appellants Leave Excellence

During the last week of September, 2010, Appellant Johanna Barton was terminated from her employment with Excellence. On October 1, 2010, the Brooks Appellants each tendered signed letters of resignation to Excellence. By October 4, 2010, all of the appellants had agreed

---

[1] We note the appellate record does not have copies of each agreement signed by the individual appellants. However, this fact does not appear to be in question.

to accept employment as loan officers at Premier Nationwide Lending. Appellants notified the Excellence loan customers, with whom they had been working, of their move to Premier. Appellants contend that each customer chose to transfer their files from Excellence to Premier so they could work with the same loan officers to complete their transactions. Each customer subsequently sent notification to Excellence requesting their files be transferred to Premier.

## B. Procedural Background

On October 7, 2010, Excellence filed suit for temporary restraining order, injunction, and damages against Premier and each appellant.[2] The trial court granted a temporary restraining order enjoining Appellants and Premier from, among other things, using Excellence's confidential information to contact any of Excellence's customers with whom the individual appellants had served as loan officers while employed by Excellence. Shortly thereafter, Excellence settled their claims with Premier. Premier returned the loan files in question and agreed not to accept further transfers. Appellants assert this action resulted in a lost ability to earn commissions thereby causing them severe financial losses.

On March 14, 2011, Appellants filed a counter-claim against Excellence asserting various claims, including breach of contract, unlawful restraint of trade, and interference with prospective business relations. In November of 2011, Excellence filed a motion for summary judgment as to Appellants' breach of contract, tortious interference, and antitrust claims. Appellants filed a response to the summary judgment motion and, in June of 2012, Appellants filed a cross-motion for traditional and no-evidence partial summary judgment as to Excellence's claims: breach of contract, breach of fiduciary duty, tortious interference with prospective contracts, trade secret

---

[2] Although there were other parties to the injunction, only Excellence and Appellants Barry Brooks, Heston C. King, Stefen Douglas Brooks, Johanna Barton, and Jesse Rodriguez Benavides are relevant to this appeal. Accordingly, we restrict our discussion to these parties.

misappropriation, breach of contract claim arising out of settlement agreement with Premier, and fraud.

After a hearing, on July 18, 2012, the trial court granted summary judgment in favor of Excellence as to Appellants' (1) breach of contract claims for loans closed and funded after October 1, 2010, (2) interference with prospective business relations claims, and (3) antitrust claims. All other claims within both summary judgment motions were denied. The trial court subsequently severed all the issues disposed of by the July 18, 2012 order on Appellants' and Excellence's summary judgment motions.

**SUMMARY JUDGMENT IN FAVOR OF EXCELLENCE**

**A.**     **Standard of Review**

  *1.*  *Review of Trial Court Grant of Summary Judgment in Favor of Excellence*

An appellate court reviews a traditional summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 805 (Tex. App.—Dallas 2008, pet. denied). To obtain summary judgment, the movant must establish there are no issues of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Nixon v. Mr. Prop. Mgmt.*, 690 S.W.2d 546, 548 (Tex. 1985). "An appellate court reviewing a summary judgment must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam); *accord W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005); *Nixon*, 690 S.W.2d at 548–49. When reviewing a summary judgment, "we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented." *Goodyear Tire*, 236 S.W.3d at 755.

*2.      Review of Trial Court's Denial of Summary Judgment in Favor of Appellants*

Excellence asserts this court does not have jurisdiction over the trial court's denial of Appellants' motion for summary judgment because the trial court's order severing the case does not permit Appellants to seek review of the trial court's denial of their motion for summary judgment. Appellants contend the motions for summary judgment are competing motions.

The general rule is that a party cannot appeal the denial of a motion for summary judgment. *See Cont'l Cas. Co. v. Am. Safety Cas. Ins. Co.*, 365 S.W.3d 165, 172 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). "The party's remedy is to assign error to the trial court's judgment ultimately rendered following trial on the merits." *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). While the appellate court does not generally review the denial of summary judgment, we may review such a denial when both parties move for summary judgment and the trial court grants one motion and denies the other. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007).

We conclude that Appellants' claims as to breach of fiduciary duty, breach of contract—confidential information, tortious interference, and misappropriation of trade secrets stem from and are based on the same factual elements and legal analysis as Excellence's motion for summary judgment. Accordingly, we have jurisdiction over these claims.

*3.      Competing Motions*

To prevail on its motion for traditional summary judgment, each movant was required to conclusively disprove at least one essential element of each of the nonmovant's claims. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999); *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 476–77 (Tex. 1995). "When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence [,] . . . determine all questions presented[,] . . . [and] render the

judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000) (citations omitted); *accord Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

### B. Breach of Contract/Quantum Meruit Claims

#### 1. *Johanna Barton Breach of Contract Claims against Excellence*

Barton was terminated for cause and did not submit a letter of resignation. We, therefore, address her breach of contract claim separately.[3]

Appellants do not address Barton individually in Appellants' Brief. However, in their reply brief, Appellants contend Excellence provided no evidence to substantiate Barton was terminated for cause. Accordingly, they contend summary judgment as to Barton's compensation prior to termination must be reversed.

The only evidence regarding Barton's termination contained within the appellate record appears to be the testimony elicited during the deposition of Kevin Sullivan, Excellence's chief financial officer. *See generally* TEX. R. APP. P. 34. Sullivan testified that Barton was terminated due to her poor attitude. Barton does not point this court to any additional evidence or any controverting evidence. Accordingly, we conclude the trial court properly granted summary judgment for Excellence as to breach of contract claims concerning Appellant Barton.

We next address the contractual claims asserted by the Brooks Appellants.

#### 2. *The Brooks Appellants' Breach of Contract Claims against Excellence*

In their cross-pleadings, the Brooks Appellants assert they closed loans prior to, during, and after Georgetown took control of Excellence's business and were simply waiting to receive

---

[3] Because Barton was subsequently hired by Premier, her remaining claims are properly addressed with the other appellants, specifically the interference with prospective business relations and antitrust under the Texas Business and Commerce Code claims.

their commissions on these loans. Excellence's failure and refusal to pay the commissions on such loans, referred to by the parties as "pipeline customers," constituted a breach of contract.

Excellence counters there could be no breach of the employment agreement because the Brooks Appellants were not legally entitled to commissions on loans that closed and funded after they resigned. As per their employment agreements, the Brooks Appellants were compensated for all their work as loan officers in accordance with the production personnel compensation plan. More specifically, Excellence contends the Brooks Appellants were paid for employment through October 1, 2010, and they were properly compensated in accordance with the company's Production Personnel Compensation Plan. The plan provides that

> In the event of voluntary termination, death or long-term disability, the Company will pay the Loan Officer, or his/her estate, commissions (above any current deficits to the Company) on any loan closed <u>and</u> funded . . . up to and includ[ing] the effective date of termination, death or long-term disability, except as herein provided. With respect to a voluntary termination, it is the Company's general policy not to pay any commissions on loans that close and fund after the effective date of the Loan Officer's termination.

### 2.     *Elements of a Breach of Contract Claim*

To recover on an action for breach of contract, a plaintiff must prove "(1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach." *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Whether a party's conduct constitutes a breach of contract is a question of law. *See E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex. App.—El Paso 2007, no pet.). If the party opposing summary judgment relies on an affirmative defense, the party must present summary judgment evidence sufficient to raise a fact issue on each element of the defense to avoid summary judgment. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Parker v. Dodge*, 98 S.W.3d 297, 300 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

3.    *Voluntary versus Involuntary Termination*

The Brooks Appellants argue they were involuntarily terminated by Excellence and, therefore, Excellence breached their employment contracts by failing to pay commissions associated with approximately ninety-one pending mortgage loans. Although each of the Brooks Appellants submitted a letter of resignation, they contend that they later realized they could not have resigned because they were involuntarily terminated when Excellence "ceased operations" on September 22, 2010.

Excellence, on the other hand, contends the Brooks Appellants voluntarily terminated or resigned and were therefore bound by the compensation provisions for voluntary termination— "any loan closed and funded up to and includ[ing] the effective date of termination." Moreover, none of the ninety-one loans about which the Brooks Appellants complain closed and funded before October 1, 2010.

Whether the termination was voluntary or involuntary requires an analysis of the summary judgment evidence.

a.    <u>Resignation Letters</u>

The letters of resignation submitted by the Brooks Appellants were effectively identical and provided as follows:

> The purpose of this letter is to announce my resignation from Excellence Mortgage, Ltd and/or Georgetown Mortgage, LLC. As per my executed compensation plan with Excellence Mortgage, Ltd., I would expect my final pay to include all commissions due for August and September 2010 closed loan files.

We note the letters do not mention Excellence "ceasing operations." Additionally, by all accounts, when the letters were presented to Excellence management, all four individuals believed they were resigning their positions of employment.

b.    Evidence Offered by the Brooks Appellants that Excellence Ceased Operations

The Brooks Appellants' summary judgment evidence, offered to support their theory of involuntary termination, included (1) Robin Morton's affidavit, the president of Excellence from July 2001 to September 2010, (2) John Hudson's affidavit, the area manager at Premier, (3) an assumed name certificate—Georgetown Mortgage, LLC d/b/a Excellence Mortgage, dated September 29, 2010, (4) the branch manager agreement between Kevin Sullivan and Georgetown, (5) Stefen D. Brooks' affidavit, and (6) the video depositions of Kevin Sullivan and Mitzi Hutchens.

i.    Morton and Hudson Affidavits

Morton was terminated from her employment at Excellence between September 22, 2010 and September 24, 2010. In her affidavit, Morton averred Excellence ceased operation on the same day she was fired, "simultaneous to my termination [Excellence] went out of business." She opined that when Excellence fired her, it turned over its mortgage business to Georgetown and that Excellence customers, staff, and investors were intentionally misled to believe they were still working with the same originating mortgage company, Excellence Mortgage.

Hudson, the area manager with Premier, testified that the identity of pipeline borrowers, which Appellants were handling at the time their employment with Excellence ended, was neither proprietary nor confidential and was actually publically recorded. Hudson also concluded that because Georgetown had taken over Excellence, and Morton, their licensed broker was no longer at the company, Excellence no longer had the ability to originate and process loans.

Excellence filed objections to both affidavits and motions to strike the evidence. Specifically, Excellence argued Morton and Hudson were incompetent to provide the questioned testimony and the testimony contained within the affidavits was conclusory and speculative. We

agree with Excellence. Neither Morton nor Hudson provided any basis for their opinions. *See* TEX. R. CIV. P. 166a(f).[4] Additionally, neither affiant provided personal knowledge about the management decisions at Excellence or the legal status of Excellence as to when the company ceased to operate. *See id.*; TEX. R. EVID. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

ii.      Assumed Name Certificate and Branch Manager Agreement between Kevin Sullivan and Georgetown Mortgage

The Brooks Appellants contend the assumed name certificate and the agreement for Sullivan to act as the bank manager are further proof Excellence ceased operations prior to the letters of resignation. The fact that Sullivan was hired as an employee of Georgetown has no legal significance as to whether Excellence Mortgage was a legal entity. In fact, the agreement does not mention Excellence Mortgage or any relationship between Georgetown and Excellence. Additionally, evidence that Georgetown Mortgage is conducting business under the assumed name of Excellence Mortgage does not provide any evidence as to whether Excellence Mortgage, Ltd. ceased operations. We, therefore, conclude these documents provide no evidence as to the operations of Appellee Excellence Mortgage, Ltd., and much less that it ceased operating as a company. *See* TEX. R. CIV. P. 166a(c), (f).

---

[4] Texas Rule of Civil Procedure 166a(f) provides:

> **Form of Affidavits; Further Testimony**. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

TEX. R. CIV. P. 166a(f).

iii.     Affidavit of Stefen Brooks

The Brooks Appellants offer the affidavit of Stefen Brooks, an interested party, to support their claim that Excellence loan officers were trained without pay by Georgetown. Brooks's affidavit is directly contradicted by the testimony of Hutchens and Sullivan.

Summary judgment may be granted on uncontroverted affidavits from interested parties; but such evidence must be clear, positive, direct, credible, free from contradictions, and susceptible of being readily controverted. *See* TEX. R. CIV. P. 166a(c). Conclusory statements in affidavits do not constitute competent summary judgment evidence. *See Burrow v. Arce*, 997 S.W.2d 229, 235–36 (Tex. 1999) (concluding affidavits that are "nothing more than a sworn denial of plaintiff's claims" are insufficient to support summary judgment; further stating that an affiant "cannot simply say, 'Take my word for it; I know'").

Here, the testimony in question is not free from contradictions. *Contra* TEX. R. CIV. P. 166a(c). Additionally, none of the resignation letters make an assertion that the Brooks Appellants were not paid for the days in question, and Sullivan's testimony directly contradicts such a conclusion. Moreover, the pleadings contend Excellence failed to pay commissions on the loans in question, not that Excellence required them to attend training without pay. Therefore, Brooks's affidavit is not proper summary judgment evidence. *See generally* TEX. R. CIV. P. 166a(f).

iv.     Video Depositions of Kevin Sullivan and Mitzi Hutchens

The Brooks Appellants further argue the video depositions of Sullivan and Hutchens provide evidence that "they did not and could not have worked for Excellence after September 23, 2010." The testimony does not support such contentions.

Hutchens, a corporate trainer for Georgetown, testified each of the loan officers signed paperwork allowing their "MLS licenses" to be updated for Georgetown Mortgage doing business as Excellence Mortgage. She explained she did not know the legal ramifications or whether

Excellence was still operating. When questioned further, Hutchens explained the loan officers "were already on board with Excellence Mortgage. They had an option to stay on board or to go elsewhere. They were already hired before [Georgetown] came on board." Hutchens explained to each loan officer that everything would remain the same about their employment until benefits could be discussed at a later time. Each of the loan officers, however, resigned prior to any information about changes to their benefits. Although the Brooks Appellants contend the evidence establishes they were not paid during their training on the Georgetown computer system, there is no evidence that any of the Brooks Appellants were paid differently during the week of training than during any other time they were employed at Excellence.

Sullivan testified that Excellence ceased to operate at some point during the first week of October, but he was unsure of the exact date. Sullivan explained the owners decided to proceed in a different direction. The plan was to phase out Excellence and it was to become MG Mortgage. He explained that all of the Excellence loan officers, specifically the Brooks Appellants, were told no changes would be made to their pay structure, commissions, or benefits at that time, but that management would be reviewing all aspects of the business.

For these reasons, we conclude neither deposition is probative evidence that the Brooks Appellants "did not and could not have worked for Excellence after September 23, 2010."

> d.     Analysis

Although the Brooks Appellants provided several affidavits, documents, and depositions as evidence that Excellence ceased operations prior to the submission of their letters of resignation, the evidence does not raise a genuine issue of material fact. The record does not contain any competent summary judgment evidence that Excellence Mortgage ceased operations prior to the Brooks Appellants' resignations thereby rendering the termination of their employment as involuntary. *See* TEX. R. CIV. P. 166a(c), (f).

We conclude the letters are probative evidence that the Brooks Appellants voluntarily terminated their positions with Excellence. The summary judgment evidence does not controvert the evidence adduced by Excellence that each Brooks Appellant resigned. There was no issue of material fact and Excellence was, therefore, entitled to summary judgment on this issue. *See* TEX. R. CIV. P. 166a(c); *Diversicare*, 185 S.W.3d at 846 (Tex. 2005); *Nixon*, 690 S.W.2d at 548.

Because there is no evidence that Excellence ceased operations prior to October 1, 2010, and there are four uncontroverted resignation letters providing the effective date of October 1, 2010, we conclude Excellence conclusively established its affirmative defense, that the Brooks Appellants voluntarily resigned their positions as loan officers under their Employment Agreement with Excellence Mortgage. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

Accordingly, the trial court properly granted summary judgment in favor of Excellence as to the alleged entitlement of commissions for loans closed and funded prior to October 1, 2010.

### 4.       *Quantum meruit*

The Brooks Appellants further contend they are entitled to reasonable compensation for their portion of loan services performed on loans which closed *after* they left their employment.

Because we have already established the Brooks Appellants voluntarily terminated their employment, we conclude they are entitled to compensation in accordance with Excellence's personnel compensation plan:

> With respect to a voluntary termination, it is the Company's general policy not to pay any commissions on loans that close and fund after the effective date of the Loan Officer's termination.

We, therefore, overrule the Brooks Appellants' claims of reasonable compensation for loan services performed on the pipeline loans based on quantum meruit.

**C.** **Appellants' Claims of Interference with Prospective Business Relations against Excellence**

*1.* *Arguments of Parties*

Appellants contend there is a reasonable probability that Appellants would have entered into further business relations with most, if not all, of the ninety-one prospective pipeline customers if Excellence had not filed its suit based on a covenant not to compete. Appellants argue that contrary to Excellence's contention that information about its pipeline customers was "confidential information" protected under Excellence's employment agreement, Excellence was attempting to convert the language in the employment agreement to a non-compete clause.

Specifically, Appellants contend Excellence intentionally interfered with these relationships by unlawful conduct—filing the groundless injunction suit against Appellants and Premier. Appellants argue the suit was asserted in bad faith, and based on the filed suit, Excellence misrepresented to prospective borrowers that they could not legally do business with Premier. Further, Excellence had no right to prevent Premier from accepting files, voluntarily transferred by the customers, from Excellence to Premier.

Excellence's position is that Excellence's information pertaining to its customers, learned by virtue of being an employee of Excellence, belongs to Excellence. Although Excellence sought to protect the names, phone numbers, and loan information on the pipeline customers, Excellence also sought to protect over 9,500 accounts with information including, but not limited to, builder names, builder lists, builder phone numbers, account balances at MG Lumber Supply, builder purchases at MG Lumber, and each customer's outstanding ledger balance.

*2.* *Elements of Claim*

To recover damages on a claim for tortious interference with a prospective relationship, the plaintiff must prove (1) there was a reasonable probability that the plaintiff would have entered

into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001); *accord COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex. App.—Dallas 2004, pet. denied).

In determining whether an actor's conduct in intentionally interfering with a prospective contractual relation of another is improper, the Second Restatement of Torts provides consideration should be given to the following factors:

(a)  the nature of the actor's conduct,
(b)  the actor's motive,
(c)  the interests of the other with which the actor's conduct interferes,
(d)  the interests sought to be advanced by the actor,
(e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f)  the proximity or remoteness of the actor's conduct to the interference and
(g)  the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767 (1979); *Boyles v. Thompson*, 585 S.W.2d 821, 831 (Tex. Civ. App.—Fort Worth 1979, no writ). The Supreme Court extended this list to look at the defendant's conduct and determined that beyond the factors provided by the Second Restatement of Torts, plaintiffs' recovery is generally allowed only when the defendant's conduct was either independently tortious or violated a law. *Sturges*, 52 S.W.3d at 725–26.

*3.     Analysis*

The tortious act alleged by Appellants is the filing of this lawsuit, an allegedly baseless and groundless suit. Yet, Appellants do not point this court to any evidence supporting their allegation

that the suit was groundless. Given the summary judgment evidence in this case, there is nothing

tortious about using the legal process to prevent loss of customers.

Filing a lawsuit is not independently a tortious act. *Gaia Techs., Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 377–78 (5th Cir. 1999); *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex. 1984), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989). Likewise, "[e]nforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract." *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 77 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Maynard v. Caballero,* 752 S.W.2d 719, 721 (Tex. App.—El Paso 1988, writ denied)).

Here, Excellence's employment agreement specifically gives Excellence the right to seek injunctive relief for failure to return company information, including customer information, after leaving employment. Specifically, the agreement provides

> Employee's breach of [confidential information paragraph] shall give the Company the right to obtain a temporary restraining order and preliminary or permanent injunction enjoining Employee from violating this Agreement in order to prevent immediate and irreparable harm to the company.

This is exactly what Excellence filed. Even if Excellence did not prevail on its suit, without any supporting evidence, we cannot conclude that Excellence lacked good faith when it filed suit or that no reasonable litigant could expect to succeed on the merits. Excellence conclusively disproved Appellant's required element of "a willful and intentional act of interference with the contract." Accordingly, we conclude the trial court properly granted summary judgment in favor of Excellence on the tortious interference claims. *See* TEX. R. CIV. P. 166a(c); *Rubio*, 185 S.W.3d at 846; *Nixon*, 690 S.W.2d at 548.

**D.      Appellants' Antitrust Claims against Excellence**

   *1.      Argument of the Parties*

Appellants contend that Excellence filed a groundless injunctive lawsuit and that Excellence used the suit as a justification for its unlawful refusal to transfer the loans as requested by the prospective borrowers.  As such, Appellants contend that Excellence's actions constituted a "contract, combination, or conspiracy in restraint of trade" as prohibited by Texas Business and Commerce Code section 15.05.  TEX. BUS. & COM. CODE ANN. § 15.05 (West 2011); *see id.* § 15.01 (identifying the Act as the Texas Free Enterprise and Antitrust Act of 1983 (Texas Antitrust Act)).

More specifically, Appellants contend Excellence's actions had an adverse effect on competition in the relevant market, i.e., San Antonio.  *See Winston v. Am. Med. Int'l*, 930 S.W.2d 945, 951–52 (Tex. App.—Houston [1st Dist.] 1996, writ denied).  Because Appellants handled a substantial portion of the dual, construction-to-permanent loan transactions executed in the greater San Antonio area, Excellence lessened competitive conditions in a relevant market.  Appellants argue that Excellence used greater restraint than necessary to protect its goodwill or other business interests because Excellence had ceased doing business at the time the suit was filed.  They conclude that Excellence's actions were willful and flagrant, and resulted in financial injury to Appellants.

Excellence counters that the confidentiality provision was a "non-disclosure agreement," not a covenant not to compete and is, therefore, beyond the reach of the Act.  *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (citing *CRC–Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 265 (Tex. App.—Houston [1st Dist.] 1996, no writ) and *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.—Dallas 1992, no writ)) ("Agreements not to disclose trade secrets and confidential information are not expressly governed by the Act.").

2.      *Texas Business and Commerce Code § 15.05*

Section 15.05 of the Texas Business and Commerce Code, provides as follows:

(a)     Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful.
(b)     It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce.

TEX. BUS. & COM. CODE ANN. § 15.05.  To establish that a defendant contracted, combined, or conspired in restraint of trade in violation of section 15.05(a), a plaintiff must show that the alleged contract, combination, or conspiracy is unreasonable and had an adverse effect on competition in the relevant market.  *See Winston*, 930 S.W.2d at 951–52; *Marlin v. Robertson*, 307 S.W.3d 418, 427 (Tex. App.—San Antonio 2009, no pet.).  "Without a showing of actual adverse effect on competition, [a plaintiff] cannot make out a case under the antitrust laws."  *MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 22–23 (Tex. App.—Dallas 1988, writ denied).  Therefore, the question before the trial court was whether Excellence's confidentiality provisions were unreasonable and had an "adverse effect on competition in the relevant market."  *Marlin*, 307 S.W.3d at 427.

The Texas Antitrust Act does not prohibit all restraints of trade, but only those resulting in an unreasonable restraint.  *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990); *Marlin*, 307 S.W.3d at 427.  Nondisclosure covenants are not considered restraints on trade because they do not restrict one's ability to compete with a former employer or prevent an employee from using general knowledge, skill, and experience.  *Zep Mfg. Co.*, 824 S.W.2d at 663; *see also Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at *10 (Tex. App.—Corpus Christi Apr. 17, 2008, no pet.) (mem. op.).  Texas law also provides the formation of an employment relationship forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer.  *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21–22 (Tex. App.—Houston

[1st Dist.] 1998, pet. dism'd). This obligation survives termination of employment. *Id.* An employer may not bar use of general knowledge, skill, and experience, but an employer may prevent the former employee's use of confidential information or trade secrets acquired during the course of employment. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600–01 (Tex. App.—Amarillo 1995, no writ); *see also Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 278 (Tex. App.—Houston [1st Dist.] 1988, no writ).

*3.    Analysis*

This case turns on whether (1) Excellence was protecting confidential information or (2) the information was readily available and Excellence was attempting to restrict the Appellants' ability to compete.

We first look to the relief sought by Excellence in its original pleadings to determine the true relief desired. The application for injunctive relief requested Appellants be enjoined and restrained from utilizing Excellence's confidential information as defined by the Employment Agreement and the Employee Confidentiality Agreement:

*Employment Agreement*

4.    <u>Confidential Information</u>

(a)    <u>Provision of Confidential Information</u>. On the effective date of this Agreement and throughout the Employee's employment with the Company, the Company shall, in order for the Employee to properly and effectively perform his or her job, provide the Employee with confidential business information. The Company promises to continue to provide Employee with such information during the course of the Employee's employment with the Company.

(b)    <u>Employee to Maintain Confidentiality</u>. The Employee acknowledges that he/she occupies a position of trust and confidence in the Company, and the Employee agrees that he/she will not, without the prior written consent of the Company, disclose or make known to any person or use for his/her own benefit or gain any confidential information of the Company. Confidential information means any information not generally disclosed or

known to the trade or public concerning the Company, its business, and its customers. For purposes of this Agreement, confidential information shall include, but is not limited to, the following: (1) all information (whether maintained in the Company's computer databases, printed reports, paper files, notes, correspondence, rolodexes however kept, personal computers, PDA's, or any place else) relating to the Company's customer's[sic], including the identity of the Company's customers, customer personal data information, customer contact information, customer account information and balances, and customer investment preferences; (2) all information relating to the Company's business and marketing plans; and (3) any other information that the Company designates as confidential.

*Employee Confidentiality Agreement*

All information provided to Excellence Mortgage, Ltd. regarding borrower/co-borrower income, assets, and all other information pertinent to their loan transaction is private and sensitive in nature and considered confidential. Confidential information should not be discussed by any employee unless it [ ] pertains to his or her specific job requirements.

Appellants counter that the information used to contact and continue their work with the pipeline customers was information available outside of Excellence's employment. Specifically, Appellants contend

1)  the identities of (non-repeat) customers were recorded in public real estate records when construction (interim) loans were made;
2)  Excellence circulated the list of its pipeline customers to its wholesale lender pool (Premier) while seeking loans for them and to insurance agents while assisting the customers in shopping for competitive homeowners insurance premium;
3)  Information was not limited to Excellence's management employees, all Excellence employees knew the names in the regular course of business;
4)  Residential mortgage loan customers are generally one-time customers;
5)  Loans are sold by loan officers, not management;
6)  Customers are not contractually bound to Excellence;
7)  Excellence did not have a list of repeat customers developed and protected over a long period of time; and
8)  Appellants knew the customers, did not need a list from Excellence, and did not take any documents or customer lists when they left.

Once again, although Appellants point this court to a list of complaints, there is no probative evidence to support their contentions. *See* TEX. R. CIV. P. 166a(c), (f); *Burrow*, 997 S.W.2d at

235–36. The record does not support that the information the Brooks' Appellants utilized to contact the "pipeline customers" was located by means other than through Excellence's confidential information.

Excellence contends that the information used by Appellants was confidential information not available to the public. Attached to the motion for summary judgment was Sullivan's deposition, a person with first-hand knowledge of the information provided to the employees. *See* TEX. R. CIV. P. 166a(f). Sullivan explained that not only was the information about the customers in question provided by Excellence to the Appellants, but that Excellence spent years gathering the information and that such information was not available to the public.

Appellants attempt to couch their argument in terms of an unreasonable covenant not to compete, yet the plain language of Excellence's requested relief was to enforce the nondisclosure covenants contained within the employment agreements. *Zep Mfg. Co.*, 824 S.W.2d at 663. Information containing the names and addresses of individuals with whom the loan officers came into contact during their employment at Excellence, is precisely the information Appellants each contracted with Excellence not to disclose. There is no evidence Excellence sought to prevent Appellants from working or being employed by Premier; they simply sought the protection of the confidential information outlined in Appellants' employment agreements.

Accordingly, section 15.05 of the Texas Business and Commerce Code's prohibition against antitrust actions does not apply and the trial court properly granted summary judgment in favor of Excellence. *See Marsh USA Inc.*, 354 S.W.3d at 768.

## CONCLUSION

Appellant Johanna Barton was terminated by Excellence and the compensation owed was outlined in her employment agreement. The Brooks Appellants voluntarily terminated their employment by letters of resignation on October 1, 2010. Thus, in accordance with Excellence's

personnel compensation plan, and the resignation letters, the Brooks Appellants were only entitled to commissions on loans that closed and funded before October 1, 2010. We, therefore, conclude the trial court properly granted summary judgment in favor of Excellence and denied Appellants' breach of contract and quantum meruit claims.

As to the tortious interference claims, there is no evidence to support Appellants' claim that Excellence's lawsuit was groundless and filed as an attempt to prevent Appellants from working in their field of work. Whether Excellence would ultimately prevail on the suit is irrelevant. The fact remains that the employment contract signed by each loan officer provided Excellence with the right to seek injunctive relief for the improper use of Excellence's confidential information. Because the summary judgment evidence conclusively disproves that Excellence undertook "a willful and intentional act of interference with the contract," we conclude the trial court properly granted summary judgment in favor of Excellence on the issue of tortious interference with prospective contractual relations.

Finally, the allegations concerning antitrust violations are also unfounded. Excellence's injunction sought nothing more than to prevent dissemination of the client information in accordance with their employment agreement and there is no evidence the suit was an attempt to prevent Appellants from competing in the loan mortgage business. We, therefore, conclude that because the prohibition against antitrust actions is inapplicable to this case, the trial court properly granted summary judgment in favor of Excellence.

Patricia O. Alvarez, Justice