

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00056-CV

**IN RE METHODIST HEALTHCARE SYSTEM OF SAN ANTONIO, LTD., LLP,** Relator

Original Proceeding[1]

Opinion by:     Irene Rios, Justice

Sitting:       Rebeca C. Martinez, Chief Justice
              Irene Rios, Justice
              Lori I. Valenzuela, Justice

Delivered and Filed: November 27, 2024

PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED

In this original proceeding, relator Methodist Healthcare System of San Antonio, Ltd., LLP ("Methodist") asserts the trial court abused its discretion by ordering it to produce documents protected under the medical peer review privilege. We agree and conditionally grant mandamus relief.

### BACKGROUND

In the underlying matter, real party in interest, J. Marvin Smith III, M.D. ("Dr. Smith"), a cardiothoracic surgeon, asserts that Methodist undertook a smear campaign against him in reaction to Dr. Smith's opposition to a new hospital policy requiring Methodist-employed physicians to

---

[1] This proceeding arises out of Cause No. 2020-CI-18056, styled *J. Marvin Smith III, M.D. v. Methodist Healthcare System of San Antonio, Ltd., LLP*, pending in the 150th Judicial District Court, Bexar County, Texas, the Honorable Rosie Alvarado presiding.

prescribe consultations with its in-house intensivists and other heart specialists.[2] Dr. Smith asserts Methodist initially sought to force his compliance with this new policy but later sought to force him out of practice—purportedly so that he could not compete against Methodist's in-house cardiothoracic surgeons.

Dr. Smith asserts that Methodist pursued those goals by: 1) disseminating flawed mortality rate information relating to surgeries he had performed; 2) instructing referring physicians to refer their patients to Methodist's in-house cardiothoracic surgeons rather than Dr. Smith; 3) refusing to confirm the status of his privileges at Methodist (which caused the loss of privileges at Baptist Health System hospitals); 4) undertaking a malicious "sham" medical peer review process; and 5) relying upon an "inaccurate" competency assessment finding Dr. Smith was not fully competent to practice medicine.

Dr. Smith filed suit against Methodist on September 18, 2020, asserting Methodist's actions smeared his reputation, caused his loss of privileges at other hospitals, and prevented him from earning any income.

Shortly after filing suit, Dr. Smith propounded discovery requests seeking documents and testimony that Methodist objected to on various grounds including an assertion of the medical peer review privilege. On November 25, 2020, Methodist filed a motion for a protective order asserting some of the discovery sought by Dr. Smith was protected from disclosure under the medical peer review privilege. On January 19, 2022, the trial court granted the motion for protective order in part, holding that "all documents produced for *in camera* inspection, except communications directly from Dr. Smith and his attorney to the Peer Review Committee (the "Committee"), shall be protected as privileged and not subject to disclosure."

---

[2] Dr. Smith's allegations are taken from his March 18, 2024 Second Amended Original Petition, the live petition when the trial court made the discovery ruling at issue in this original proceeding.

On September 22, 2022, Dr. Smith filed a motion to reconsider the order protecting certain documents from disclosure under the medical peer review privilege and a motion to compel discovery responses and deposition testimony. On March 14, 2023, Dr. Smith filed a supplement to these motions. On January 16, 2024, the trial court granted Dr. Smith's supplemental motion for reconsideration and motion to compel, finding that the anticompetitive exception to the medical peer review privilege applies.

On January 24, 2024, Methodist filed its original petition for writ of mandamus and a motion for emergency temporary relief. Two days later, the trial court amended its order, instead requiring Methodist to provide the documents at issue to the court for in camera inspection rather than producing them directly to Dr. Smith. On March 25, 2024, the trial court ruled that the anticompetitive exception to the medical peer review privilege applied to all but one of the documents provided for in camera inspection.

On April 4, 2024, Methodist filed an amended petition for writ of mandamus, asserting that the anticompetitive exception does not apply to any of the documents at issue because Dr. Smith's allegations do not establish the exception.

### REQUIREMENTS FOR GRANTING A WRIT OF MANDAMUS

Mandamus is an extraordinary remedy that will issue only to correct a clear abuse of discretion when the relator has no adequate remedy by appeal. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 623 (Tex. 2007) (orig. proceeding). A relator has no adequate remedy by appeal when the denial of mandamus relief would result in an "irreversible waste of judicial and public resources[.]" *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136–37 (Tex. 2004) (orig. proceeding) (quoting *In re Masonite Corp.*, 997 S.W.2d 194, 198 (Tex. 1999) (orig. proceeding)).

Mandamus is appropriate to review a trial court's pre-trial discovery orders. *In re Aguilar*, No. 04-13-00425-CV, 2013 WL 4501435, at *2 (Tex. App.—San Antonio Aug. 21, 2013, orig.

proceeding) (mem. op.) (citing *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992) (orig. proceeding)); *see also In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 279 (Tex. 2016) (orig. proceeding) ("We have long held that 'a party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error.'") (quoting *Walker*, 827 S.W.2d at 843). "Mandamus is proper when the trial court erroneously orders the disclosure of privileged information because the trial court's error cannot be corrected on appeal." *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 697–98 (Tex. 2015) (orig. proceeding).

"Whether a discovery privilege applies is a matter of statutory construction." *Christus Santa Rosa*, 492 S.W.3d at 280. "Statutory construction is a question of law we review de novo." *Mem'l Hermann Hosp.*, 464 S.W.3d at 700. "When construing a statute, we look to the plain language to determine the intent of the [l]egislature." *Christus Santa Rosa*, 492 S.W.3d at 280. "If the statute is unambiguous, we apply the words according to their common meaning, but we may consider the objective of the law and the consequences of a particular construction." *Id*. "If the documents at issue are alleged to be privileged, 'mandamus is appropriate if we conclude that they are privileged and have been improperly ordered disclosed.'" *Christus Santa Rosa*, 492 S.W.3d at 279 (quoting *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 256 (Tex. 2005) (orig. proceeding)).

**ANALYSIS**

Methodist asserts that the trial court erred when it applied the anticompetitive exception to documents protected by the medical peer review privilege because these documents cannot be relevant to an anticompetitive action since Dr. Smith failed to plead an anticompetitive action. We agree.

"Pleading and producing evidence establishing the existence of a privilege is the burden of the party seeking to avoid discovery." *Mem'l Hermann Hosp.*, 464 S.W.3d at 698. "The party asserting the privilege must establish by testimony or affidavit a prima facie case for the privilege."

*Id.* "If the party asserting the privilege establishes a prima facie case for the privilege and tenders documents to the trial court, the trial court must conduct an in camera inspection of those documents before deciding to compel production." *Christus Santa Rosa*, 492 S.W.3d at 279 (internal quotation marks omitted). "Once the party claiming privilege presents a prima facie case that the documents are privileged, the burden shifts to the party seeking production to prove that an exception to the privilege applies." *Id.* at 279–80.

## A.     The medical peer review privilege

Subsection 160.007(a) of the Texas Occupations Code mandates that "each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged." TEX. OCC. CODE. ANN. § 160.007(a). "A medical peer review committee includes a committee of a health care entity including a hospital licensed under Chapter 241 or 577 of the Health and Safety Code or the medical staff of a health care entity that (1) operates under written bylaws approved by either the policy-making or governing board of the health care entity, and (2) is authorized to evaluate the quality of medical and health care services or the competence of physicians." *Mem'l Hermann Hosp.*, 464 S.W.3d at 698 (alterations omitted); *see also* TEX. OCC. CODE. ANN. § 151.002(a)(5) (defining "Health care entity"); § 151.002(a)(8).

"[T]he overarching purpose of the medical peer review committee privilege is to foster a free, frank exchange among medical professionals about the professional competence of their peers." *Christus Santa Rosa*, 492 S.W.3d at 280–81 (alterations omitted). "[T]he statutory privilege attaches to an investigation, review, *or other deliberative proceeding* of a medical committee." *Mem'l Hosp.-The Woodlands v. McCown*, 927 S.W.2d 1, 9 (Tex. 1996) (orig. proceeding) (internal quotation marks omitted); *see Living Ctrs. of Tex.*, 175 S.W.3d at 258 ("The purpose of medical peer review, as the plain language of the statutes makes clear, is protection of

an evaluative process, not mere records."); *see also Mem'l Hermann Hosp.*, 464 S.W.3d at 698–99 ("All proceedings and records of a medical peer review committee are confidential, and all records of, determinations of, and communications to a committee are privileged and are not discoverable, with certain exceptions.") (alteration omitted).

"'Medical peer review' means the evaluation of medical and health care services, including the evaluation of the qualifications and professional conduct of professional health care practitioners and of patient care provided by those practitioners." *In re Christus Santa Rosa Healthcare Corp.*, 617 S.W.3d 586, 593 (Tex. App.—San Antonio 2020, orig. proceeding) (internal quotation marks omitted); *see also* TEX. OCC. CODE §151.002(a)(7). "The term includes evaluation of the merits of a complaint relating to a health care practitioner and a determination or recommendation regarding the complaint and the report made to a medical peer review committee concerning activities under the committee's review authority." *In re Christus Santa Rosa*, 617 S.W.3d at 593 (alterations omitted). "Furthermore, the privilege from discovery under section 160.007 [of the Texas Occupations Code] is not restricted to communications to a medical peer review committee during the course of a specific investigation or an ongoing proceeding." *Id*. (alterations omitted) (quoting *Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12, 19 (Tex. 1996) (orig. proceeding)). "Even a 'gratuitous' communication to a peer review committee about the qualifications of a physician or the quality of health care provided by that physician is within the scope of section 160.007." *Id*. (alterations omitted) (quoting *Brooks*, 927 S.W.2d at 19).

## B. Methodist established a prima facie case that the medical peer review privilege applies.

As the party seeking to avoid discovery, Methodist had the burden to establish a prima facie case for the privilege by testimony or affidavit. *See Mem'l Hermann Hosp.*, 464 S.W.3d at 698. Methodist presented the trial court with the affidavit of Sheryl Vickers Maniscalco, the Director of Medical Staff Services for Methodist, in which Maniscalco testified that some of the

documents sought by Dr. Smith were related to the medical peer review process at Methodist and that documents relating to Methodist's peer review process "are not made or maintained in the regular course of business by Methodist." Maniscalco also testified the documents are shared only with medical staff members and employees who sit on the peer review committee, and the documents are "strictly confidential." She further averred peer review documents are "created in pursuit of the quality improvement function of [Methodist] to improve patient care and treatment through peer evaluation[.]" Methodist also presented the trial court with Methodist's "United Bylaws of the Medical Staff," which defines and governs the medical peer review program at Methodist. We conclude these documents were sufficient to establish a prima facie case that the medical peer review privilege applies. *See Mem'l Hermann Hosp.*, 464 S.W.3d at 700 (determining trial court had sufficient evidence to find committees were medical peer review committees when the hospital submitted the committees' bylaws and affidavits stating the committees engaged in peer review).

Once Methodist established a prima facie case that the medical peer review privilege applies, the trial court was required to conduct an in camera inspection of those documents before deciding to compel production. *See Christus Santa Rosa*, 492 S.W.3d at 279 (stating an in camera review of documents is required once a prima facie case for the privilege is established). We conclude the trial court's application of the anticompetitive exception to all of the documents ordered to be produced implies a finding that all of these documents are protected under the medical peer review privilege.[3] *See Mem'l Hermann Hosp.*, 464 S.W.3d at 700 ("The trial court found 'that the anticompetitive exception to the medical peer review committee privilege applies,' which inherently implies a finding that the relevant committees were medical peer review

---

[3] In its Order for Production of Documents after In Camera Inspection, the trial court found "that all documents are discoverable under the anticompetitive exception to the medical peer review committee privilege, with the exception of the document listed as bates stamp 'Smith.MHS.01877.Privileged' that is not discoverable."

committees."). Here, the record reflects the trial court had sufficient evidence before it to make a reasonable finding that the documents are part of a medical peer review process, and we will not disturb that finding. Dr. Smith does not contend otherwise.[4]

Because Methodist established a prima facie case that the medical peer review privilege applies, we must now determine if Dr. Smith demonstrated an exception to the privilege. *See Christus Santa Rosa*, 492 S.W.3d at 279–80 ("Once the party claiming privilege presents a prima facie case that the documents are privileged, the burden shifts to the party seeking production to prove that an exception to the privilege applies.").

## C.     The Anticompetitive Exception to the Medical Peer Review Privilege.

Dr. Smith asserts that the documents at issue are discoverable because the anticompetitive exception to the medical peer review privilege, under subsection 160.007(b) of the Texas Occupations Code, applies. Subsection 160.007(b) states:

> If a judge makes a preliminary finding that a proceeding or record of a medical peer review committee or a communication made to the committee is *relevant to an anticompetitive action*, or to a civil rights proceeding brought under 42 U.S.C. Section 1983, the proceeding, record, or communication is not confidential to the extent it is considered relevant.

TEX. OCC. CODE. ANN. § 160.007(b) (emphasis added). Thus, subsection 160.007(b) provides a "limited exception" to the medical peer review privilege for documents a trial court determines are "*relevant to an anticompetitive action*." *Mem'l Hermann Hosp.*, 464 S.W.3d at 700 (emphasis added). Relevance, however, "cannot be determined in isolation of the elements of an asserted cause of action." *Id.* at 703. Accordingly, "the limited waiver of confidentiality for proceedings,

---

[4] In his response to Methodist's mandamus petition, Dr. Smith affirms that "[t]he sole issue before the Court in this Mandamus is whether the Trial Court abused its discretion by compelling Methodist to produce documents to Dr. Smith based on the anticompetitive exception to the medical peer review privilege."

records, and communications 'relevant to an anticompetitive action' can only apply if the plaintiff asserts a cause of action that requires proof of anticompetitive conduct or effects." *Id*. at 704.[5]

The Texas Supreme Court explained that mere allegations of "anticompetitive" conduct are not enough to mandate the application of the exception. *Id.* at 709–10. "To successfully allege injury to competition, a claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Id.* (alteration omitted). "At a minimum, the claimant must sketch the outline of the antitrust violation with allegations of supporting factual detail." *Id*. at 710 (internal quotation marks omitted).

"An antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Marlin v. Robertson*, 307 S.W.3d 418, 425 (Tex. App.—San Antonio 2009, no pet.) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). "Antitrust laws are designed to protect competition rather than individual competitors." *Marlin*, 307 S.W.3d at 425. "Therefore, the injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* (alteration omitted).

Accordingly, "a plaintiff does not plead an antitrust claim merely by alleging that he has suffered economic injury; rather, he must allege that a defendant's conduct caused an 'antitrust injury' by imposing an unreasonable restraint on trade." *Montoya v. San Angelo Cmty. Med. Ctr.*, No. 03-16-00510-CV, 2018 WL 2437508, at *6 (Tex. App.—Austin May 31, 2018, pet. denied) (mem. op.). "Whether the practice constitutes an improper restraint of trade will depend upon whether the plaintiff's allegations suggest a market in which the removal of a single competitor from the pool of competing sellers would adversely and unreasonably affect overall competitive

---

[5] *See also Mem'l Hermann Hosp.*, 464 S.W.3d at 704 n.74 ("[T]here is no practical difference between the terms anticompetitive conduct and anticompetitive effects as used in the caselaw, because we do not deem conduct anticompetitive unless it has a net anticompetitive effect.").

conditions." *Mem'l Hermann Hosp.*, 464 S.W.3d at 710 (internal quotation marks and alterations omitted); *see also Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 712 (Tex. App.—Amarillo 2018, pet. denied) ("To prevail on an improper restraint of trade claim, a plaintiff must 'plead a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market.'") (alteration omitted) (quoting *Mem'l Hermann Hosp.*, 464 S.W.3d at 709).

"In sum, [the Texas Supreme Court has held] that the exception to the medical peer review committee privilege for anticompetitive actions applies when the plaintiff asserts a cause of action that requires proof that the conduct at issue has a tendency to reduce or eliminate competition that is not offset by countervailing procompetitive justifications." *Mem'l Hermann Hosp.*, 464 S.W.3d at 706 (internal quotation marks omitted).

**D.      Dr. Smith has not shown the anticompetitive exception applies.**

Dr. Smith has not met his burden to demonstrate the anticompetitive exception applies because he has not alleged facts showing that Methodist's purported actions caused an antitrust injury. Because he did not establish that the documents protected by the medical peer review privilege are relevant to an anticompetitive action, he has not shown he is entitled to the discovery he seeks. *Id.* at 704.

Dr. Smith claims Methodist's allegedly tortious actions against him were initially designed to force his compliance with Methodist's new in-house referral policy; however, he claims they were ultimately used to force him out of practice so that he could not compete against Methodist's in-house surgeons. Dr. Smith asserts these actions smeared his reputation, caused his loss of privileges at other hospitals, and prevented him from earning any income. But these alleged injuries to Dr. Smith—absent any assertion that Methodist's conduct also "caused  an 'antitrust

injed' by imposing an unreasonable restraint on trade"—are insufficient to plead an anticompetitive action. *See Montoya*, 2018 WL 2437508, at *6.

> [A] plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury. For example, the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. If the law were otherwise, *many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action*. To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market.

*Marlin*, 307 S.W.3d at 429 (internal quotation marks and citations omitted) (emphasis added).

Dr. Smith's petition contains just two references to harm beyond that purportedly suffered by Dr. Smith—neither of which amounts to an allegation of an antitrust injury.

First, he asserts in a conclusory manner that his inability to perform surgeries in San Antonio caused certain patients to seek care outside of the San Antonio market:

> The actions of Methodist denied Dr. Smith to treat patients in the San Antonio geographic market. Upon information and belief, many of the most critically ill patients that would have been treated by Dr. Smith were sent to other geographic markets for care. Had Dr. Smith not been denied privileges at other hospital systems based on Methodist's conduct, he could have treated these patients.

The *Marlin* Court rejected an antitrust claim by a physician who made a similar assertion but failed to demonstrate "an adverse effect on competition in the relevant market." 307 S.W.3d at 429.

> [T]he plaintiffs alleged that only twelve physicians in all of Texas practice pediatric neurosurgery and only at certain hospitals, with two of these hospitals located in San Antonio (Methodist Children's and Christus). The plaintiffs also alleged that after they left Bexar County, only two neurosurgeons practicing pediatric neurosurgery remained in the market, Drs. Tullous and Mancuso at Christus, neither of whom are board certified in pediatric neurosurgery. However, Marlin admitted at his deposition that pediatric neurosurgery is part of a general neurosurgeon's training and the Board of Neurological Surgeons considers general neurosurgeons qualified to perform pediatric neurosurgery.
>
> Although plaintiffs argued that quality of care was diminished because patients were restricted to physicians not board-certified in pediatric neurosurgery and who were not always available to treat them, the plaintiffs did not contend prices for pediatric neurosurgery services would increase over the competitive level; no evidence was offered that pediatric patients were unable to obtain necessary

services in Bexar County; and no evidence was offered to support the plaintiffs' speculation that the welfare of consumers of pediatric neurosurgery services was damaged, that there was a decrease in the quality of services available, that the cost of pediatric neurosurgery has risen, or that the hospitals have raised their rates or changed their behavior in any anti-competitive way.

*Id.* at 430-31; *see also Batra*, 562 S.W.3d at 712 (concluding a physician's testimony that a hospital "derived an illegal benefit from termination of his privileges by limiting patient choice in the Lubbock area," was not "clear and specific evidence that his removal from the pool of interventional gastroenterologists in the area would adversely and unreasonably affect overall competition.").[6]

Dr. Smith fails to claim that Methodist's alleged actions either left San Antonio patients without adequate cardiothoracic surgeons or caused costs for cardiothoracic surgeries in San Antonio to rise above a competitive level. Accordingly, this claim lacks any factual assertions showing that Methodist's actions caused "an unreasonable restraint on trade" and created market conditions that forced these patients to seek care elsewhere.

In his second assertion of harm to the market, Dr. Smith states that Methodist's actions "impact[ed] other referring physicians, anesthesiologists, and hospitals who would otherwise work with Dr. Smith . . . [which] had a net negative impact on competition for his niche specialty of cardiac surgery in the San Antonio area." But even if these entities and persons had suffered harm because they were unable to work with Dr. Smith—a contention Dr. Smith does not explain—this conclusory assertion still fails to assert facts showing a reduction of competition in the market, which is required to plead an antitrust injury. *See Mem'l Hermann Hosp.*, 464 S.W.3d at 709; *see also Champion Printing & Copying LLC v. Nichols*, No. 03-15-00704-CV, 2017 WL 3585213, at

---

[6] While the decision in *Marlin* examined the evidentiary burden at the summary judgment stage, and the decision in *Batra* analyzed whether a physician had established a prima facie case in response to a hospital's motion to dismiss brought under the Texas Citizens Participation Act, both are instructive regarding the types of factual allegations needed to assert an antitrust injury.

*13 (Tex. App.—Austin Aug. 18, 2017, pet. denied) (mem. op.) (holding the plaintiff must show his injury coincides with "the public detriment that generally results from the alleged violation").

While Dr. Smith alleges Methodist engaged in anticompetitive conduct, he has failed to plead facts showing Methodist's conduct imposed an unreasonable restraint on trade. This failure to plead facts that, if true, would cause an "antitrust injury" amounts to a failure to plead an anticompetitive action. *See Mem'l Hermann Hosp.*, 464 S.W.3d at 704 n.74 ("[W]e do not deem conduct anticompetitive unless it has a net anticompetitive effect."); *Montoya*, 2018 WL 2437508, at *7 ("Having failed to allege facts that, if true, would show that defendants' alleged actions injured competition in the relevant market, Montoya failed to plead against Brewer an antitrust claim having a basis in law."); *see also Champion Printing*, 2017 WL 3585213, at *14 ("Hayes's restraint-of-trade cause of action was based entirely on Nichols and Lindberg's alleged interference with Hayes's contracts. As such, these facts do not allege illegal restraint of trade as it is recognized under the Texas Antitrust Act.").

**CONCLUSION**

Subsection 160.007(b) provides an exception to the medical peer review privilege for proceedings, records, or communications that are "relevant to an anticompetitive action." TEX. OCC. CODE. ANN. § 160.007(b). Accordingly, this limited waiver "can only apply if the plaintiff asserts a cause of action that requires proof of anticompetitive conduct or effects." *Mem'l Hermann Hosp.*, 464 S.W.3d at 704. Because Dr. Smith failed to allege an antitrust injury, he failed to plead an anticompetitive action. Accordingly, subsection 160.007(b) does not apply.

Therefore, we conclude the trial court erred when it ruled that the anticompetitive exception to the medical peer review privilege applies to the discovery sought by Dr. Smith. We conditionally grant the writ of mandamus and direct the trial court to vacate its March 25, 2024 Order for

Production of Documents after In Camera Inspection. The writ will issue only if the trial court fails to vacate this order within fifteen days from the date of our opinion and order.

Irene Rios, Justice